[Crim. No. 22546. June 9, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
BENJAMIN WAI SILVA, Defendant and Appellant.

**COUNSEL**

Emry J. Allen, under appointment by the Supreme Court, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Jay M. Bloom and Robert M. Foster, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**LUCAS, C. J.—**

## I.

### INTRODUCTION

On June 29, 1981, a first amended information was filed in Lassen County Superior Court charging defendant, Benjamin Wai Silva, with murdering Kevin Thorpe and Laura Craig. Both counts of the information alleged six special circumstances: murder for financial gain (Pen. Code, § 190.2, subd. (a)(1); all further statutory references are to this code); multiple murder (*id.* subd. (a)(3)); murder of a witness to prevent testimony (*id.* subd. (a)(10)); heinous, atrocious and cruel murder (*id.* subd. (a)(14)); felony murder (robbery and kidnapping for robbery) (*id.* subd. (a)(17)); and torture murder (*id.* subd. (a)(18)). The information also alleged that defendant was armed with, and used, firearms in the commission of the murders (§§ 12022, subd. (a), 12022.5).

The information also charged defendant with kidnapping and robbing Kevin and Laura. Each of these four counts additionally alleged that defendant was armed with and used a firearm, and inflicted great bodily injury (§ 12022.7). The seventh count in the information charged defendant with unlawful possession of a machine gun (§ 12220), and the eighth count charged him with unlawful possession of a silencer for a firearm (§ 12520).

Three additional counts were severed prior to trial and therefore are not before us.

Also on June 29, defendant filed a motion for change of venue which was granted; the case was transferred to San Bernardino County.

On August 5, 1981, defendant's motion to dismiss under section 995 was granted in part. Specifically, the court struck the witness-murder special circumstance with respect to both Kevin and Laura, the torture-murder special circumstance with respect to Kevin, and the felony-murder (robbery) special circumstance with respect to both murder charges. The felony-murder (kidnapping for robbery) special circumstance was left intact. The court also struck the allegation that defendant used a machine gun in counts 5 and 6 (robbery of Kevin and Laura), but left intact the charge that he used a handgun.

On January 11, 1982, a second amended information was filed in San Bernardino County, reflecting an order permitting the district attorney to reinstate the witness-murder special circumstance as to both murder counts, and to allege that, with respect to the robbery charges in counts 5 and 6, defendant was armed with, and personally used, a shotgun and a machine gun, as well as a handgun.

A jury found defendant guilty of first degree murder of Kevin and found each of the special circumstances (except for the multiple-murder allegation) and enhancements in count 1 to be true. Defendant was found not guilty of the murder of Laura. The jury found defendant guilty as charged with respect to every other count in the information and found all of the enhancements charged therein true, except for the great bodily injury enhancements charged in counts 4 and 6 (the kidnapping and robbery of Laura). Defendant was subsequently sentenced to death. This appeal is automatic. (§ 1239, subd. (b).)

As will appear, we reject defendant's claims of prejudicial error and affirm the judgment in its entirety.

## II.

### FACTS

On January 11, 1981, Kevin Thorpe and his girlfriend Laura Craig left Ridgecrest, California, for Oregon where they attended college. They were driving Kevin's white four-door Ford Elite, which was pulling a utility trailer containing their belongings. They were driving north on Highway

395 through Madeline, California, when their trailer suffered a flat tire. They pulled into a gas station in town and Kevin set to work repairing the tire, a project that—due to complications—required several hours. Around 9 p.m., the operator of the gas station offered Kevin and Laura a place to stay for the night; they declined, expressing their desire to reach Oregon that night. The tire was eventually fixed and the couple resumed their journey.

That same evening, defendant, Joe Shelton and Norm Thomas also planned a trip to Oregon. The three men lived on Shelton's property, which was located about seven miles west of Madeline. They had been talking about women that evening and when Thomas told the others that he knew some women in Oregon, they decided to drive up and see them. They left Shelton's property in defendant's truck around 8 p.m., and stopped at the gas station in Madeline to fill up the tank.

Defendant saw Kevin working on the trailer's flat tire when he pulled into the gas station. He also saw Laura and told Thomas and Shelton that he desired her. While driving away from the gas station, defendant explained to Shelton and Thomas his plan for kidnapping the couple: The men would wait for the car to drive by and then stop it by signaling with a red light. Defendant and Shelton, armed with guns, would then approach the vehicle and drive it back to Shelton's cabin. Thomas would follow, driving defendant's truck. Shelton objected to the plan because he was well known in the small town. It was therefore decided that Thomas would accompany defendant in place of Shelton.

Defendant stopped the truck and backed it into a side road adjoining Highway 395. Thomas and Shelton exited the car and traded places so that Shelton was now sitting in the middle of the front seat. The three waited for approximately an hour before Kevin's car drove by.

In accordance with his plan, defendant followed. After a short distance he took a spotlight covered with a red lens and held it out the window, pointing it at Kevin's car. Kevin pulled over and defendant pulled up behind him. As he exited the truck, defendant handed the spotlight to Shelton and instructed him to turn it off if another vehicle came by. Defendant then walked to the driver while Thomas approached the passenger. Defendant pointed a shotgun at Kevin's face and commanded him to move over; defendant sat behind the wheel and Thomas, armed with a pistol, entered the back seat. Defendant placed the shotgun on the floorboard and pulled out a .44 magnum. He cocked the weapon, pointed it at Kevin's chin, and warned him not to try anything because the gun had a hair trigger.

Defendant then drove the vehicle to Shelton's cabin and Shelton followed in the truck.

After arriving at the cabin, defendant picked up his shotgun and ordered Kevin and Laura out of the car. He told Thomas to drive their vehicle further up the road and to leave it there. Thomas complied. Before he left the vehicle, however, he shot and killed a dog in the back seat of Kevin's and Laura's car.

Thomas returned to the cabin about half an hour later. He found Kevin and Laura on the couch. Defendant and Shelton left Thomas with the couple and exited the cabin. They returned shortly with numerous items which they had stolen from the couple's car and trailer.

Defendant and Shelton then began discussing what should be done with Kevin. They decided to chain him up for the night. Chains were placed around Kevin's body, secured by locks, and Kevin was taken outside where he was chained to a tree by his neck; Thomas was left in the cabin to watch Laura. When defendant and Shelton returned, defendant told Thomas that they had taken Kevin's wallet and gave Thomas $200 as his share of the loot. He then recruited Thomas to help him dispose of Kevin's car. Following defendant's instructions, Thomas drove the Ford to an area about 10 miles from Adin, California. Defendant drove behind Thomas in his truck. When Thomas stopped the car, defendant changed his plans for the vehicle. He had originally told Thomas that the car would be blown up; instead, the battery was removed from the car, its right rear tire was flattened, and defendant and Thomas wiped the car down to remove fingerprints. They did not return to Shelton's cabin until early the following morning.

They found Shelton asleep with Laura when they returned; Shelton stated he had had intercourse with her several times while she was at the cabin. When he awoke, Shelton and defendant left the cabin. Thomas had intercourse with Laura while they were gone. Thereafter, Thomas left the cabin and found defendant and Shelton standing around a burn barrel. They were burning several items which they had taken from Kevin and the car, including Kevin's belt buckle, car keys, papers that were taken from the car, and the trailer's license plate which had been cut up to hinder identification. Defendant told Thomas to follow him and he led Thomas up the side of the hill where Thomas found Kevin's body lying on the ground with a carpet thrown over it. There was blood everywhere. Defendant told Thomas that he had some trash bags and that he wanted Thomas to cut Kevin's body into pieces small enough to fit inside those bags. Thomas took an axe and, fearing he would be killed if he failed to comply, chopped Kevin's body into at least 10 pieces as defendant looked on.

Thomas took between two and three hours to chop up the body in accordance with defendant's directions. Thomas was sick several times during the task. Defendant watched the entire process and inquired whether he should keep Kevin's skull as a souvenir. He rejected the idea because the skull would contain bullet holes.

When Thomas was finished cutting up the body, defendant told him to clean the area and to burn any bloody items. Kevin's clothes, the axe, and some brush were thrown into the burn barrel. While the three men were standing around the fire, Shelton recounted to Thomas the following facts surrounding the murder: Defendant and Shelton unlocked the chain linked to Kevin's neck from the tree; the other end of the chain was still locked to the chains around Kevin's neck. Kevin was led, terrified and crying, up the side of a hill. Defendant left Shelton to watch him and went to a trailer on Shelton's property to obtain a weapon. (The trailer belonged to Thomas but defendant had been renting it from him and it contained defendant's possessions.)

Defendant returned with an Ingram M-11 .38-caliber fully automatic pistol which had a silencer on it. The M-11 is a machine gun: the magazine clip holds 32 rounds and the gun can discharge all 32 rounds in 1.6 seconds. It is impossible to fire the gun only one shot at a time. Defendant walked up behind Kevin and shot him up and down his body at close range. Kevin fell. Defendant then gave the weapon to Shelton who emptied the rest of the magazine clip into Kevin's body. It is unclear whether 1 or 2 clips were discharged (i.e., whether Kevin was shot 32 times or 64 times). But it is clear that Kevin was shot everywhere—"he had holes in his face, [and] all up his arms and legs."

Defendant did not interrupt or comment while Shelton described the murder; he simply looked at Shelton and smiled. Defendant and Thomas subsequently drove to Spooner Lake and buried the pieces of Kevin's body; each trash bag was placed in its own shallow grave.

The day after the burial, Shelton directed Thomas to cover Kevin's and Laura's trailer with brush. Laura was kept at the cabin for several days until January 16. Prior to Laura's abduction, Thomas had heard defendant and Shelton discuss plans for kidnapping a woman and forcing her to have intercourse with them. On one such occasion, Thomas heard them add that they would have to kill the victim afterwards. While Shelton and Thomas had intercourse with Laura, it is unclear whether defendant committed such acts. Defendant did, however, force Laura to perform oral copulation, holding a cocked gun at Laura's head and threatening to blow her head off if she did not comply.

On January 16, Thomas saw defendant and Shelton drive off with Laura between them. Shelton later told Thomas that somewhere near Mount Shasta defendant stopped the truck. Shelton assumed that defendant wished to change drivers so he exited and walked to the rear of the truck. As he reached the tailgate he heard a gunshot and saw Laura leaning over, holding onto her side. According to Shelton, defendant pulled Laura out of the car by her hair and shot her in the head. The gun was thrown into a river and Laura's body was kicked down the hillside.

Defendant and Shelton returned to the cabin on January 20. Shelton related to Thomas the facts of Laura's murder, and again defendant, who had been listening, merely smiled. The next day, defendant and Shelton again left the cabin, telling Thomas to hide all of the weapons in case the police came around. An hour or two after they left, Lassen County Deputy Sheriff Bruce Steltzer arrived at the cabin looking for Shelton. As he drove up, Steltzer saw Thomas working on a pickup truck and observed him place something in the truck. Steltzer spoke with him for awhile and then asked if he could search the truck. Thomas asked if Steltzer had a search warrant; Steltzer admitted he did not and asked if he should leave. Thomas said "yes," and Steltzer began walking back to his car.

Before he reached his car, Thomas stopped Steltzer and told him that he had put a gun in the truck. Steltzer returned and asked why Thomas had not simply admitted that earlier. Thomas said that he was on probation and that he was not permitted to possess a gun. Steltzer removed the bullets from the weapon, returned it to Thomas and left. Steltzer then ran a check on Thomas and, upon receiving confirmation that Thomas had violated the terms of his probation, returned to Shelton's property with about 10 other officers and arrested Thomas.

Once in custody, Thomas told the police that he had been involved in some terrible crimes and he inquired whether he would receive police protection if he talked. Thomas was promised protection and the district attorney was called in to speak with him. Thomas detailed the fate of Kevin and Laura, including his own participation in the mutilation and burial of Kevin's body.

An intensive search followed with Thomas's active participation. The white Ford was found where it had been left. Most of Kevin's body was found. The red lens that had been used to stop Kevin's car was found, as were several of the items stolen from Kevin and the vehicle. Kevin's trailer was found, still covered with brush, and the burn barrel also contained incriminating evidence, including Kevin's car and house keys, his post office box key, and his United States Navy belt buckle.

The search also turned up one of the weapons used in the murders—the Ingram M-11 .38-caliber machine gun. Among the weapons found on the property which were linked to defendant rather than Shelton were: an Ingram M-10 9-millimeter fully automatic pistol; the Ingram M-11 with silencer and flash suppresser (which hides the muzzle blast so that the shot cannot be seen when it is dark); a .22-caliber bolt action rifle; a Colt AR-15 .223-caliber fully automatic rifle with tripod and scope; an AK-47 fully automatic rifle; an M-14 fully automatic rifle; the barrel assembly of an M-16 rifle; a 20-gauge Browning automatic shotgun; and a Remington sawed-off shotgun. A machine gun is simply a fully automatic firearm; thus, five machine guns were found on the premises.

Shelton was arrested on January 30. The boots Kevin had been wearing when he left Ridgecrest were found in Shelton's possession. The next day, Shelton led officers to the location of Laura's body. Defendant was arrested in Fresno on January 23. He was informed of his rights but waived them, choosing to speak with police. When asked what he thought would be the outcome of his trial, defendant said he would either be sent to jail for a long time or be put to death. He also wrote on the walls of his cell that "Joe Shelton is a rat. Norman Thomas is a rat."

Thomas pleaded guilty to "[p]articipation in the kidnapping, accessory after the fact to murder, burglary, and use of a firearm." He was ultimately sentenced to 11 years and 4 months in prison, but had not been sentenced prior to defendant's trial. Thomas also faced possible murder charges if he failed to cooperate with the district attorney's office. Defense counsel placed these facts in evidence. (We are not informed what was the disposition of Shelton's case.)

The jury deliberated for two days before finding defendant guilty of first degree murder of Kevin Thorpe, and also finding true the five special circumstance allegations relevant to that murder. The jury also found the arming and use allegations true, and convicted defendant of kidnapping for robbery of Kevin and Laura, robbery of Kevin and Laura, possession of a machine gun, and possession of a silencer for a firearm. The jury additionally found each of the arming and use allegations in counts 3 through 6 to be true, and the intentional infliction of great bodily injury allegations in counts 3 and 5 (kidnapping for robbery and robbery of Kevin) to be true.

The jury acquitted defendant of the murder of Laura, and found that he did not inflict bodily injury upon her. Accordingly, the jury likewise rejected the multiple-murder special-circumstance allegation.

The penalty phase of defendant's trial was held February 16, 1982, and the jury returned its verdict of death the same day. Defendant's motion for

a new trial or modification of sentence was heard and denied March 15, 1982, and the court sentenced defendant to death the same day.

### III.

### GUILT PHASE CONTENTIONS

A. *The Faretta Motion*

The record includes a "settled statement" concerning an unreported in camera meeting between defendant and the magistrate who was to preside over defendant's preliminary examination; the meeting took place prior to the hearing. According to the settled statement, defendant told the magistrate that he wished to marry and inquired how this might be done. The magistrate responded that he did not perform inmate ceremonies but opined that another judge might be willing to do so. Defendant then indicated that, with respect to the charges filed against him, he wished to "get it over with and plead guilty." The magistrate told defendant that he believed defendant "may have some meritorious legal points or issues and that [he] should go ahead and talk to his attorney." Defendant said he did not wish to be represented by an attorney, and the magistrate confessed that he was unsure whether a defendant in a capital case could proceed in propria persona. The magistrate also observed that appointed counsel was a good attorney. The meeting then concluded.

■ Defendant now claims that his desire not to be represented by counsel constituted a timely request to proceed in propria persona. Defendant asserts he was then entitled to a determination as to whether he was voluntarily and intelligently waiving his right to counsel. Because the court failed to inquire into his competency to waive counsel, defendant asserts the court committed reversible error.

In *Faretta* v. *California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525], the United States Supreme Court held that "a State may [not] constitutionally hale a person into its criminal courts and there force a lawyer upon him" (*id.* at p. 807 [45 L.Ed.2d at p. 566]) because the Sixth Amendment "implies a right of self-representation" (*id.* at p. 821 [45 L.Ed.2d at p. 574]). ■ However, a defendant is not absolutely entitled to represent himself. "[I]n order to represent himself, the accused must 'knowingly and intelligently' forego [the benefits associated with the right to counsel]. [Citations.] Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, *he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is*

*doing and his choice is made with eyes open.'* [Citation.]" (*Id.* at p. 835 [45 L.Ed.2d at pp. 581-582], italics added.)

 Here, the magistrate did not advise defendant that he was barred from proceeding in propria persona. The essence of the discussion was that defendant should first speak with his attorney about the defense of the case and should also consider the competence of his legal counsel before attempting to represent himself. In sum, we find the magistrate was simply advising defendant to further explore "the dangers and disadvantages of self-representation" so that he might make his ultimate choice "with eyes open." Defendant was at all times free to proceed with his desire to plead guilty (assuming he could obtain his attorney's consent, see § 1018), or to request permission to represent himself. We find no error in the magistrate's actions.

## B. *The Marsden Hearing*

At the August 5, 1981, hearing in the Lassen County Superior Court on defendant's motions to dismiss the information and to suppress evidence under sections 995 and 1538.5, a discussion took place between defendant and the court wherein defendant moved to dismiss his attorney because "I feel he is not competent . . . , doesn't have my best interest at heart. . . . [H]e's just not doing his job to the best of his ability, and this case is a death sentence case and I feel that it's important I have a competent lawyer to handle it." The court responded that "I'm going to need more showing than that," and observed that defendant's counsel was doing a "bang-up job on your behalf. . . . He wants to look out for your interest even when you don't want to do something. . . . The motion will be denied."

Defendant, after being permitted to elaborate, indicated that "I wanted him [counsel] to make a motion against Norman Thomas, against the competency of him being, you know, a witness, a competent witness." The court explained that the competency of witnesses is a matter to be decided by the trial judge once trial commences. The court concluded by denying the motion "without prejudice" to renewal before the San Bernardino County Superior Court, where the case was to be transferred. Evidently, defendant declined to renew his motion at that time.

 Defendant claims that the court violated the mandate of *People* v. *Marsden* (1970) 2 Cal.3d 118, 123-124 [84 Cal.Rptr. 156, 465 P.2d 44] because of "the complete absence of any inquiry of appellant as to why he wished to discharge his lawyer." Defendant's reliance upon *Marsden* is misplaced. There, the trial court refused to allow the defendant to present evidence of counsel's inadequacy or incompetency. We found error, but

noted that a defendant does not have the right to the appointment of new counsel absent a clear showing of inadequate representation.

■ As we stated in *Marsden,* " 'A defendant's right to a court-appointed counsel does not include the right to require the court to appoint more than one counsel, except in a situation where the record clearly shows that the first appointed counsel is not adequately representing the accused. . . . "The right of a defendant in a criminal case to have the assistance of counsel for his defense . . . may include the right to have counsel appointed by the court . . . discharged or other counsel substituted, if it is shown . . . that failure to do so would substantially impair or deny the right . . . , but the right to such discharge or substitution is not absolute, in the sense that the court is bound to accede to its assertion without a sufficient showing . . . that the right to the assistance of counsel would be substantially impaired . . . in case the request is not granted, and within these limits there is a field of discretion for the court." ' [Citations.]" (2 Cal.3d at p. 123.) In *Marsden,* we also found it impossible for a court to properly exercise its discretion without first "listening to [the] reasons for requesting a change of attorneys." (*Ibid.*)

■ In defendant's case, the court did just that. Defendant informed the court why he wished substitute counsel and the court responded to each reason. Defendant's first point was his belief that his attorney was incompetent and did not have his best interests at heart. The court responded that, based on the record before it, counsel was competent and acting in defendant's best interests. Defendant's second reason was that his attorney failed to make certain motions he wished made. The court explained that the motions defendant had in mind either were not legally cognizable or were not properly before the Lassen County Superior Court in light of the venue change to San Bernardino County. Defendant's third reason was that he simply did not relate well to his attorney, who had only seen him once. But the number of times one sees his attorney, and the way in which one relates with his attorney, does not sufficiently establish incompetence. Defendant was required to show more.

As *Marsden* recognized, "the decision whether to permit a defendant to discharge his appointed counsel and substitute another attorney during the trial is within the discretion of the trial court, and a defendant has no absolute right to more than one appointed attorney." (2 Cal.3d at p. 123.) Here, the court listened to defendant's reasons for requesting substitute counsel—unlike the court in *Marsden*—and found that defendant had made an insufficient showing. We find no basis in this record for concluding that the court abused its discretion in denying defendant's motion.

## C. The Constitutionality of the "Adoptive Admission" Exception to the Hearsay Rule

At trial, Shelton invoked his self-incrimination privilege and refused to testify. Nonetheless, Thomas testified to statements made to him by Shelton concerning Kevin's murder. Thomas testified as follows: "[Shelton] said [he and defendant] went out and unchained the guy from the tree and walked him up side of the hill and [Shelton] had to sit and watch the guy while [defendant] went to my trailer that he had back in the woods at this time to get the machine gun and [Shelton] said the man was crying, you know, while [defendant] was gone. [Shelton] said the man was crying and [Shelton] told him [to look around] because it would be the last thing he'd see. He was afraid that [defendant] was going to shoot from way back where my trailer was where he went to get the machine gun so he sit [*sic*] pretty far behind the guy when he had the man on a rock, you know, and he said that [defendant] didn't shoot from back there, that he walked right behind the guy and shot him up and down the back." Thomas also testified that, according to Shelton, once Kevin fell, Shelton took the machine gun from defendant and shot Kevin as well. Thomas testified he knew defendant could hear Shelton's explanation because "he looked over at [Shelton] and smiled" while Shelton was speaking.

■ Defendant had made a pretrial motion to suppress this testimony, asserting that it did not fall within the adoptive admission exception to the hearsay rule because Shelton's statements "were made in a setting wherein there was no reply called for." The court disagreed, ruling that "I cannot find as a matter of law that . . . [defendant] was not called upon to respond to the accusation. I think that whatever your status in society may be, if you are present when somebody accuses you of a capital crime of which you are innocent some response would be elicited, whatever the circumstances are. [¶] Therefore, I think it is not illogical to conclude that these two statements and [defendant's] failure to respond constitute adoptive admissions." The court denied the motion.

Evidence Code section 1221 provides, "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth." There are only two requirements for the introduction of adoptive admissions: "(1) the party must have knowledge of the content of another's hearsay statement, and (2) having such knowledge, the party must have used words or conduct indicating his *adoption* of, or his *belief in,* the truth of such hearsay statement." (1 Jefferson, Cal. Evidence Benchbook (2d ed. 1982) § 3.3, p. 175, and cases cited, italics in original.) "[A] typical example

of an adoptive admission is the accusatory statement to a criminal defendant made by a person *other* than a police officer, and defendant's conduct of silence, or his words or equivocal and evasive replies in response. With knowledge of the accusation, the defendant's conduct of silence or his words in the nature of evasive or equivocal replies lead reasonably to the inference that he believes the accusatory statement to be true." (*Ibid.*) Here, defendant heard Shelton describe the circumstances surrounding Kevin's murder (satisfying the first requirement), and smiled without protesting or denying Shelton's description (satisfying the second requirement). This evidence was sufficiently relevant to be submitted to the jury under appropriate instructions.

■ Defendant contends, however, that this exception to the hearsay rule violates his right of confrontation. (U.S. Const., Sixth Amend.) Defendant acknowledges that we unanimously rejected a similar constitutional challenge in *People* v. *Preston* (1973) 9 Cal.3d 308, 315-316 [107 Cal.Rptr. 300, 508 P.2d 300], and we find no reason to reexamine our holding in that case. In *Preston,* we stated: "We find no merit in the contention that the admission of this evidence [statements impliedly adopted by the defendant] impaired defendant's Sixth Amendment right to confrontation, and to cross-examination of his accuser. The evidence was admitted not to prove the truth of the statements but to show defendant's response to them. Credibility of the witnesses who testified that they heard these accusations and observed defendant's response, and the weight to be given to their testimony were in issue and they were cross-examined on *voir dire* and before the jury." (*Preston, supra,* 9 Cal.3d at pp. 315-316.) Accordingly, the inability to cross-examine the person who actually made the statements was deemed immaterial. (*Id.* at p. 316.)

Defendant takes issue with *Preston's* pronouncement that the extrajudicial statements admitted in that case were "admitted not to prove the truth of the statements . . . ." (*Id.* at p. 316.) He insists that these statements (like Shelton's statements in the present case) were indeed used as substantive evidence of the defendant's guilt, and accordingly the federal confrontation clause guaranteed him the right to cross-examine the declarant. The point, however, is that by reason of the adoptive admissions rule, once the defendant has expressly or impliedly adopted the statements of another, the statements become *his own admissions,* and are admissible on that basis as a well-recognized exception to the hearsay rule. (See *Ohio* v. *Roberts* (1980) 448 U.S. 56, 65-66 [65 L.Ed.2d 597; 607-608, 100 S.Ct. 2531].) Being deemed the defendant's own admissions, we are no longer concerned with the veracity or credibility of the original declarant. Accordingly, no confrontation right is impinged when those statements are admitted as adoptive admissions without providing for cross-examination of the declarant.

The court in the present case instructed the jury in the language of CALJIC No. 2.71.5, that, "If you should find from the evidence that there was an occasion when the defendant, under conditions which reasonably afforded him an opportunity to reply, failed to make denial or made false, evasive or contradictory statements, in the face of an accusation, expressed directly to him or in his presence, charging him with the crime for which he now is on trial or tending to connect him with its commission, and if you should find that he heard the accusation and understood its nature, the circumstances of his silence and conduct on that occasion may be considered against him as indicating an admission that the accusation thus made was true. Evidence of such an accusatory statement is not received for the purpose of proving its truth, but only as it supplies meaning to the silence and conduct of the accused in the face of it; and unless you should find that his conduct at the time indicated an admission that the accusatory statement was true, you should entirely disregard the statement." This instruction was proper under *Preston*. (See also *Bourjaily* v. *United States* (1987) 483 U.S. 171 [97 L.Ed.2d 144, 107 S.Ct. 2775] [no showing of *reliability* of the statement is required where admissibility based on well-recognized exception to hearsay rule, such as coconspirator exception]; *United States* v. *Inadi* (1986) 475 U.S. 387 [89 L.Ed.2d 390, 106 S.Ct. 1121] [no showing of *unavailability* of the declarant is required where exception, such as coconspirator exception, is applicable].)

Defendant additionally challenges the failure of the trial court to instruct sua sponte that Shelton's statement—which formed the basis for the adoptive admission—must be viewed with distrust. Defendant concedes, however, that we rejected an identical argument in *Preston* (9 Cal.3d at p. 320), and we follow that holding here.

### D. *Sufficiency of the Evidence*

■ "[W]henever the evidentiary support for a conviction faces a challenge on appeal, the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People* v. *Johnson* (1980) 26 Cal.3d 557, 562 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) ■ Defendant asserts that there was no substantial evidence that defendant personally shot Kevin. We disagree. We believe that the jury could properly infer from Shelton's statement, and defendant's adoption of it, coupled with all the other circumstantial evidence implicating defendant (including his dominant role in planning and directing the kidnapping, his actions in menacing Kevin with a shotgun and other weapons, and his callous directions for disposing of Kevin's body) that defendant actively participated in Kevin's murder by personally shooting him to death.

### E. *The Assertion of Beeman Error*

■ Defendant next contends that, even assuming sufficient evidence to sustain his conviction, the court erroneously instructed the jury on a theory of aiding and abetting. (See *People* v. *Beeman* (1984) 35 Cal.3d 547, 560 [199 Cal.Rptr. 60, 674 P.2d 1318].) According to defendant, the jury might have found Shelton killed Kevin, and that defendant merely knew of Shelton's unlawful purpose without himself harboring an intent to achieve Shelton's purpose. We find this claim meritless. The jury expressly found that defendant *personally* used a machine gun and *personally* inflicted great bodily injury on Kevin; it is inconceivable that the jury could have also found that defendant did not intend to kill Kevin when he shot him with a machine gun. (See *People* v. *Leach* (1985) 41 Cal.3d 92, 104-106 [221 Cal.Rptr. 826, 710 P.2d 893]; *People* v. *Croy* (1985) 41 Cal.3d 1, 13-14 [221 Cal.Rptr. 592, 710 P.2d 392].)

### F. *The Credibility of Norm Thomas*

■ Defendant argues that "under the circumstances of this case, Thomas' testimony was so inherently unreliable that a judgment of conviction granted upon his testimony cannot be allowed to stand." Defendant reasons that Thomas's personal participation in the initial kidnapping episode and in the chopping up and burying of Kevin's body strongly indicate that Thomas was committing perjury. Further, according to defendant, the "deal" Thomas struck with law enforcement officials was also assertedly conducive to perjury.

The facts defendant cites relate solely to the *weight* to be accorded Thomas's testimony by the trier of fact, and not to his competency as a witness. The jury was well aware that Thomas was directly involved in the crimes, but this fact by itself is not sufficient ground to preclude a witness from testifying. The jury was also instructed that, as a matter of law, Thomas was an accomplice whose testimony should be viewed with distrust. The jury, despite Thomas's obvious interest and involvement, evidently believed his version of the events. We see no reasonable basis for challenging that determination on appeal.

### G. *Instruction on Other Accomplices*

■ One of the court's instructions (CALJIC No. 2.11.5) provided: "There has been evidence in this case indicating that a person other than defendant was or may have been involved in the crime for which defendant is on trial. You must not discuss or give any consideration as to why the other person is not being prosecuted in this trial or whether he has or will be prosecuted." Defendant claims this instruction was prejudicial error be-

cause "[o]bviously, if the jury was not permitted to consider the reasons for Thomas not being on trial, for any purpose, it certainly was not permitted to consider them for purposes of determining Thomas' credibility."

Defendant's claim must fall. The instruction obviously was directed toward *Shelton,* who took the stand only to invoke his Fifth Amendment privilege against self-incrimination. Moreover, it was obvious to the jury that Thomas was not being prosecuted in the same proceeding as defendant because, as defense counsel made clear, Thomas was the state's chief witness and had already pleaded guilty. The court, therefore, did not err in instructing in the language of CALJIC No. 2.11.5. Even assuming arguendo that error occurred, such error was clearly harmless given the related instructions calling for distrust of accomplice Thomas's testimony.

### H. *The Search and Seizure of Kevin's Trailer*

■ Defendant moved pretrial to suppress evidence pertaining to Kevin's trailer and its contents (various items belonging to Kevin). The basis for the motion was that the trailer was seized pursuant to a search warrant which authorized only a search of Shelton's property, whereas the trailer was in fact located on neighboring property. Were this a post-Proposition 8 case, defendant's claim would fall for lack of standing to object. (Cal. Const., art. I, § 28, subd. (d); see *Rakas* v. *Illinois* (1978) 439 U.S. 128, 133-134 [58 L.Ed.2d 387, 394-395, 99 S.Ct. 421]; *In re Lance W.* (1985) 37 Cal.3d 873, 896 [210 Cal.Rptr. 631, 694 P.2d 744].) Because this is a pre-Proposition 8 case, however, we must determine whether, under the vicarious exclusionary rule, the neighbor's rights were violated by the entry onto his property incident to the seizure of Kevin's trailer. (See *Kaplan* v. *Superior Court* (1971) 6 Cal.3d 150, 156 [98 Cal.Rptr. 649, 491 P.2d 1]; *People* v. *Martin* (1955) 45 Cal.2d 755 [290 P.2d 855].) We conclude no such violation occurred and, therefore, defendant's motion to suppress evidence pertaining to the seizure of the trailer or its contents was properly denied.

When Thomas showed the officers executing the search warrant where the trailer was hidden, they did not realize they had crossed Shelton's property line; the neighboring property was open wilderness in Lassen County without fencing or posted signs. The record indicates the area where the trailer was found was isolated and rural. As such, the search and seizure which occurred within Shelton's trailer involved a mere technical trespass onto the neighbor's realty; the neighbor had exhibited no legitimate expectation of privacy which defendant might vicariously assert. (See *People* v. *Bradley* (1969) 1 Cal.3d 80, 84-85 [81 Cal.Rptr. 457, 460 P.2d 129].) At best, the neighbor might have complained of a trespass, but we have long recognized that "the Fourth Amendment prohibits unreasonable searches and seizures, not trespasses, and that, even if the officers' entry [onto the

land] was a technical trespass, there was no violation of the Fourth Amendment." (*People* v. *Edwards* (1969) 71 Cal.2d 1096, 1104 [80 Cal.Rptr. 633, 458 P.2d 713].) Accordingly, we conclude the court did not err in denying defendant's suppression motion.

### I. *The Instruction on Flight*

■ The court read to the jury CALJIC No. 2.52, which provides that "The flight of a person immediately after commission of a crime or after he is accused of a crime is not sufficient in itself to establish his guilt but is a fact which, if proved, may be considered by you in light of all other proved facts in deciding the question of his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine." Defendant claims the court erred in giving the instruction, contending there was no evidence of flight. We find defendant's contention meritless.

We note that the evidence was sufficient to justify an inference of flight: Defendant and Shelton left Lassen County shortly after they discarded Laura's body; they instructed Thomas to hide all weapons in the event the police came around. Defendant was later arrested hundreds of miles away in Fresno. We find these circumstances sufficient to justify leaving to the jury the question whether defendant's conduct constituted flight within the meaning of CALJIC No. 2.52. Moreover, we believe that under the evidence, any error in instructing on flight was harmless; on these facts it is not reasonably probable a result more favorable to defendant would have been reached absent such an error. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

### J. *The Instruction on General Intent*

The court read to the jury CALJIC No. 3.30, which provides that "In the crimes charged in Counts 7 and 8 and the lesser included offenses of Kidnapping and False Imprisonment within the offense of Kidnapping as alleged in Counts 3 and 4, there must exist a union or joint operation of act or conduct and general criminal intent. To constitute general criminal intent it is not necessary that there should exist an intent to violate the law. When a person intentionally does that which the law declares to be a crime, he is acting with general criminal intent, even though he may not know that his act or conduct is unlawful." Defendant contends that this instruction required the jury to "draw a conclusive presumption of intent based upon the doing of a particular act" and that this error mandates reversal of his conviction for possession of a silencer for a firearm (count 8).

Defendant argues the jury should have been allowed "to reject the inference of 'general criminal intent' even if it found that defendant intentionally

did a particular act which the law declares to be a crime." (He fails to explain why the instruction did not also infect his convictions for kidnapping and unlawful possession of a machine gun.) In essence, defendant challenges the concept of general intent crimes. We reject the challenge; CALJIC No. 3.30 properly instructs on general intent.

### K. *The Miranda Claim*

Shortly after defendant's arrest, Lassen County Undersheriff Lino Callegari interviewed him. The interview was tape recorded. Initially, Callegari informed defendant of his *Miranda* rights (*Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974]) and obtained a waiver of them. The interview proceeded and defendant answered several questions. In particular, he admitted that he knew Shelton and that he had been staying with Shelton in the town of Madeline during the relevant time period. He also admitted seeing Kevin changing the tire on his trailer and seeing Laura with him at the cafe. He remembered filling his truck with gasoline and Shelton paying for it. He also recalled that the truck left the gas station and pulled off the side of the road (waiting for Kevin's vehicle). When asked if he saw Kevin's vehicle later or if defendant was driving the truck, defendant responded, "I don't know." Callegari again asked defendant if he was driving the truck and defendant said, "I don't know. I really don't want to talk about that."

The interview continued, and Callegari asked questions involving areas other than the identity of the person driving the truck. Callegari noted that there were other areas which defendant indicated he did not wish to discuss. According to Callegari, "any time I hit on an area where I'm getting into the, concentrating [on] the, homicide, [defendant] gets evasive to a point: doesn't deny, does not admit, stays in limbo." Defendant continued, however, to answer other questions.

Defendant now claims that his statement, "I really don't want to talk about that" represented an invocation of his rights to remain silent and that any further questioning occurred in violation of his *Miranda* rights. The trial court properly rejected this argument.

Having obtained defendant's consent to the questioning, Callegari was free to interview defendant until he exercised his privilege against self-incrimination. (*People* v. *Randall* (1970) 1 Cal.3d 948, 955 [83 Cal.Rptr. 658, 464 P.2d 114].) A suspect may do so by "refus[ing] to sign a waiver of his constitutional rights[,] . . . refus[ing] to continue an interrogation already in progress[,] or . . . [by] ask[ing] for an attorney." *(People* v. *Ireland* (1969) 70 Cal.2d 522, 535 [75 Cal.Rptr. 188, 450 P.2d 580, 40 A.L.R.3d 1323].) A defendant may indicate an unwillingness to discuss

certain subjects without manifesting a desire to terminate "an interrogation already in progress." (See, e.g., *People* v. *Watkins* (1970) 6 Cal.App.3d 119, 124 [85 Cal.Rptr. 621].)

 Here, the trial court listened to the tape recording and found that "[I]n this case . . . [defendant] does not claim that he had invoked his constitutional rights directly, but indirectly. *And if you listen to the portion of the tape to which I listened, it is clear from the inflection that he was not even intimating that he wished to terminate the interrogation* when he said, 'I don't know, I really don't want to talk about that.' " In light of the court's finding and our independent review of the tape recording, we find these statements were admissible and were not obtained in violation of his *Miranda* rights. (See *People* v. *Duren* (1973) 9 Cal.3d 218, 238 [107 Cal.Rptr. 157, 507 P.2d 1365].)

### L. *Evidence of Defendant's Consciousness of Guilt*

After defendant's arrest in Fresno, Callegari drove him to Sacramento. As they approached a San Francisco Bay Area freeway offramp, defendant volunteered, "Why don't you just take me to the gas chamber at San Quentin. Turn here, take me over to the gas chamber at San Quentin." Defendant had objected to admission of the statement on relevance grounds, but the court denied the motion, finding the statement probative evidence of consciousness of guilt. Defendant now contends that the statement was, in effect, an offer to plead guilty, and therefore inadmissible under Evidence Code section 1153. Defendant cannot challenge admission of the statement on a ground not advanced at trial. But even if we were to reach the merits of defendant's claim, defendant's statement clearly was not an offer to plead guilty.

### IV.

### SPECIAL CIRCUMSTANCES CONTENTIONS

### A. *Murder for Financial Gain*

In light of our opinion in *People* v. *Bigelow* (1984) 37 Cal.3d 731, 751 [209 Cal.Rptr. 328, 691 P.2d 994], we must set aside the financial-gain special-circumstance finding. Under *Bigelow*, such a finding is improper where the murder is not "an essential prerequisite to the financial gain sought by the defendant." (*Ibid.*) As the Attorney General now concedes, under the evidence and instructions in this case the jury could have found the financial-gain special circumstance true without making the determination required by *Bigelow*. The Attorney General urges us to reconsider *Bigelow*, but we see no reason to do so in this case.

## B. *Murder Heinous, Atrocious and Cruel*

In light of our opinion in *People* v. *Superior Court* (*Engert*) (1982) 31 Cal.3d 797 [183 Cal.Rptr. 800, 647 P.2d 76], we must also set aside the jury's finding that the murder of Kevin was "heinous, atrocious and cruel" (§ 190.2, subd. (a)(14)). The Attorney General urges us to reconsider *Engert,* but again we see no reason to do so in this case.

## C. *Witness-murder*

Defendant asserts that there is insufficient evidence to support the finding that Kevin was murdered to prevent him from testifying against defendant at some future date. He insists that any such conclusion is purely speculative, relying upon *People* v. *Bigelow, supra,* 37 Cal.3d 731, to support his claim. The Attorney General insists that the record in this case supports a finding of witness-murder.

Thomas testified that he had earlier heard defendant discuss the prospect of kidnapping a woman and bringing her to Shelton's cabin, and that on at least one such occasion, defendant acknowledged that the victim would have to be killed because she would know too much. The Attorney General argues that since defendant formed kidnapping and murder plans that were subsequently precisely followed there is sufficient evidence to support a finding of witness-murder.

We disagree. The kidnapping, robbery and murder were part of one continuous transaction. A witness-murder special-circumstance finding must fall if the killing was committed "during the commission, or attempted commission of the crime to which [the person killed] was a witness." (§ 190.2, subd. (a)(10).) Clearly, if defendant had only robbed Kevin and then killed him, a witness-murder special-circumstance finding could not stand because the murder was committed during the commission of the robbery. Similarly, if defendant had only kidnapped and killed Kevin and Laura, a witness-murder special-circumstance finding could not stand because the murder was committed during the commission of the kidnapping. Here, the Attorney General argues that Kevin "witnessed" the robbery of Laura. But again, the robbery of Laura was part of the same continuous criminal transaction which included the kidnapping of Laura and Kevin and the robbery of Kevin. Lacking evidence that the murder was not simply part of the same continuous criminal transaction, we must set aside the witness-murder special-circumstance finding.

Accordingly, we need not reach defendant's alternative argument that a witness-murder finding is inconsistent with a financial-gain or kidnapping-for-robbery finding.

### D. *Felony-murder (Kidnapping for Robbery)*

■ Defendant urges that the felony-murder (kidnapping for robbery) special-circumstance finding (§ 190.2, subd. (a)(17)) must be set aside. He argues that, while he may have kidnapped Kevin and Laura in part for the purpose of robbing them, he had completed robbing Kevin prior to killing him. Defendant contends that because the intent to rob no longer existed at the time of the killing, the jury could not find the kidnapping-for-robbery special-circumstance allegation true even though the kidnapping was a continuing offense.

Defendant's claim lacks merit. The statutory language requires that "[t]he murder [be] committed while the defendant was engaged in . . . [k]idnapping [for robbery]." No additional requirement exists that defendant, having completed the crime of robbery, harbor the intent to rob the victim again at the time of the killing. "A victim forcibly transported without [his] consent is still 'kidnaped' while the detention continues and an injury inflicted during detention is inflicted 'in the commission of' the kidnaping." (*People* v. *Farmer* (1983) 145 Cal.App.3d 948, 952 [193 Cal.Rptr. 788].) Because Kevin was still being detained at the time of his murder, he was killed while defendant was engaged "in the commission of" the kidnapping. This fact is sufficient to sustain the special circumstance finding. (Cf. *People* v. *Green* (1980) 27 Cal.3d 1, 61 [164 Cal.Rptr. 1, 609 P.2d 468].) ·Accordingly, the felony-murder (kidnapping for robbery) special-circumstance finding must be sustained.

### V.

### PENALTY PHASE CONTENTIONS

### A. *Invalid Special-circumstance Findings*

■ Defendant asserts that the setting aside of some of the special circumstance findings requires reversal of the penalty. We find defendant's assertion to be without merit given the fact that there remained one valid felony-murder (kidnapping for robbery) special-circumstance finding. The United States Supreme Court has upheld a death penalty where one of the several aggravating circumstances found true by the jury was subsequently held invalid. (*Zant* v. *Stephens* (1983) 462 U.S. 862 [77 L.Ed.2d 235, 103 S.Ct. 2733].) Moreover, in a case similar to the present case, *People* v. *Allen* (1986) 42 Cal.3d 1222 [232 Cal.Rptr. 849, 729 P.2d 115], we held that jury consideration of eight excessive special-circumstance findings was harmless in light of the fact that three valid special-circumstance findings remained. (Pp. 1281-1283.) We nonetheless examine the merits of the issue in some detail.

Does setting aside the financial-gain murder, heinous-murder, and witness-murder special-circumstance findings require reversal of the death sentence? We conclude that in the present case the jury's consideration of the invalid special-circumstance findings was harmless error and could not have affected its penalty verdict.

Nothing occurring during the penalty phase would have led the jury to place undue emphasis on the invalid special-circumstance findings. At the penalty phase, the prosecution presented only two witnesses. First, a police officer testified that defendant threatened to kill the first police officer who set foot in his cell unless defendant was allowed to see his wife. The second witness, a federal agent, testified that in the course of arresting defendant for attempting to manufacture methamphetamines, he recovered more than 60 firearms, including machine guns, from the building where defendant had built his drug lab. The jury was also told that defendant had various prior felony convictions: grand theft (auto), attempt to manufacture methamphetamine, and three counts of possession of prohibited firearms, i.e., machine guns.

Defendant called four witnesses. Three of them were friends who testified, in essence, that he was not a violent man and that they had met socially with him several times before his arrest. The fourth witness was a police officer who testified that defendant had complained to him that he had been ill-treated by other officers.

The court allowed the defense and prosecution to alter the usual order of closing penalty phase arguments—i.e., defense first closed, then the prosecution, and then defense gave rebuttal. The thrust of defense counsel's closing argument was that each juror was individually responsible for deciding defendant's fate, and therefore he or she must not vote for death simply because the other jurors choose to do so. He explained that the jury should consider defendant's "background, his age, his character, whether or not he's any trouble in custody" as mitigating circumstances. He reminded the jury that defendant refused to implicate Shelton and Thomas in the crimes. Counsel opined that defendant feared death, but stressed that his fear derived from concern and love for his family. Counsel told the jury that defendant had said he would not hurt anybody if allowed to live in prison. Finally, defense counsel concluded by once again stressing that the jury, as individuals, would be responsible for defendant's death if they invoked that penalty.

The prosecutor first told the jury that no one would enjoy imposing the death penalty—and that he did not enjoy seeking it—but that the jury should sentence defendant to death if it found that this case was an appropriate one. Specifically, the prosecutor argued that, "if you conclude that

the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death. You shall impose a sentence of death. *The question in the abstract, or just generally, is "What is there in mitigation in this case? What mitigates [defendant's] conduct?"* (Italics added.) The thrust of the prosecutor's closing argument was not to stress the nature or number of the special circumstances found to be true, but the absence of any factors in mitigation.

The prosecutor emphasized this central point: That nothing mitigated the circumstances of this crime. He observed that the details of Kevin's murder were no longer the issue of inquiry or discussion. "The murder of Kevin Thorpe, kidnapped to rob him, killed for financial gain, killed to prevent his testimony, to prevent this day, and indeed heinous, atrocious, cruel, depraved behavior—this has already been decided. It's not a matter for a determination of whether these circumstances exist. *The point now is: What could possibly, possibly come into this case to soften what we know now [defendant] did? What is there to weigh against the propriety, against the rightness of the maximum punishment? The circumstances of the crime and the existence of those special circumstances—those four special circumstances that you found true? The circumstances of this crime; these kidnappings, robberies, possession of these weapons, this murder? What weighs against this?"* (Italics added.)

The prosecutor's brief reference to the special circumstance findings equated them with the circumstances of the crime; thus, the few times that reference was made to them, the jury's attention was drawn not to the fact that it had previously found several "special circumstances" but to the *facts* behind those findings, that is, to "the circumstances of this crime." The prosecutor told the jury that, in his mind, defendant's prior felony convictions did not justify putting defendant to death. Rather, he believed that the only aggravating circumstance which warranted such a penalty was "The incredible murder of Kevin Thorpe."

The prosecutor stressed that the murder was senseless: "That's where the truly chilling, truly awesome nature of this crime, comes home to us. What did this man [defendant] do, and to whom did he do it? What in the world did Kevin Thorpe do to inspire these actions? He fixed his tire. He left for Oregon. What can we weigh against the atrocious, depraved murder of that young man who had nothing in the way of contact, nothing to provoke this defendant, Benjamin Silva?"

The prosecutor listed several possible mitigating circumstances and argued that they simply did not exist. He asked, "What is there [in mitigation] that's even considerable in this case compared to those crimes [for which he was convicted] and the murder of Kevin Thorpe? *Nothing in this evidence is*

*on the scale to outweigh that aggravation."* (Italics added.) He argued that defendant was very dangerous and that the victim had done absolutely nothing to provoke defendant. Finally, the prosecutor concluded that, "[defendant's] conduct calls down his judgment, ladies and gentlemen. *What could weigh in comparison to the aggravating factors, in comparison to the crimes you found him guilty of? What could weigh against the death penalty in this case?* It's our unpleasant duty that we have to deal with this, but we do. It's not pleasant, but I think it is clear that there could not be a more appropriate case." (Italics added.)

Defense counsel, in rebuttal, argued that it is a terrible thing to put someone to death; defendant had committed no prior murders and was unlikely to do so in the future; the particular circumstances of this case were the same as those of any other kidnapping to commit robbery and murder; defendant did not shoot anyone when he was arrested, nor did he constitute any problem while in custody pending trial; defendant would be a productive person if allowed to live. Counsel concluded, "I submit, ladies and gentlemen, that there are more than adequate circumstances to justify a verdict in this case of life without possibility of parole."

It is clear that the focus of the arguments on both sides was the presence or absence of mitigating circumstances and whether they outweighed the aggravating circumstances. Both sides also apparently conceded that the critical aggravating circumstance was the crime itself, "the circumstances of the offense." Though an isolated reference was made to the number of special circumstance findings, their existence was not emphasized as an aggravating factor. The prosecutor essentially relied generally on the circumstances of the offense. There was no attempt to argue that the number of special circumstances, rather than the facts underlying each such finding, justified imposition of the death penalty or should be given weight by the jury.

In light of the manner in which the special circumstance findings were argued, we conclude that a reasonable juror would not have been swayed by abstract concepts of "heinous," "financial gain," or "witness" murder, but would instead have focused on the actual circumstances of the offense which formed the foundation for finding those special circumstances to be true.

Additionally, the court instructed the jury that, "In determining which penalty is to be imposed on the defendant, *you shall consider all of the evidence which has been received during any part of the trial of this case.* You shall consider, take into account, and be guided by the following factors, if applicable: A) The circumstances of the crimes of which the defendant was

convicted in the present proceeding and the existence of any special circumstances found to be true . . . ." (Italics added.)

The court also instructed the jury not to simply count up the factors on each side, but to give each factor the weight to which it was entitled. We conclude from the foregoing arguments and instructions that the jury's verdict was not affected by the invalid special-circumstance findings.

### B. *Defendant's Threat to Kill a Guard*

 Defendant challenges the admission of his statement to a police officer that he would kill the first police officer to step inside his cell if he was not permitted to visit with his wife. Defendant claims that this statement was inadmissible, relying upon our opinion in *People* v. *Boyd* (1985) 38 Cal.3d 762 [215 Cal.Rptr. 1, 700 P.2d 782]. The Attorney General concedes the error, but argues it was harmless.

In *Boyd,* the prosecution introduced evidence of the defendant's threats against juvenile hall counselors. The theory upon which the prosecution relied was that the threats "proved the crime of inciting to riot." Defense counsel on cross-examination disagreed and moved to strike the evidence. The court denied the motion and instructed the jury not to consider the threats as aggravating factors unless they found that the prosecution proved incitement to riot beyond a reasonable doubt. On appeal, we concluded that there was insufficient evidence to support submitting such a charge to the jury. (*Id.* at pp. 777-778.)

As previously indicated, the Attorney General concedes *Boyd* error but argues that "the evidence in question is so trivial when compared to [defendant's] crimes and the other proper evidence adduced at the penalty phase" that the error was harmless. We agree. Defendant's threat was probably viewed by the jury as no more than heated frustration from being deprived of visits by his wife. It is virtually inconceivable that the jury would have reached a different penalty verdict had it not heard the evidence.

### C. *Evidence of Flight*

Defendant complains of testimony by a federal agent who testified at the penalty phase that defendant was a federal fugitive at the time of his arrest for Kevin's murder. The relevant interchange occurred during a discussion of defendant's 1980 felony conviction for attempt to manufacture methamphetamine and possession of machine guns. The following colloquy took place: "Q. Was Mr. Silva present at the time of his conviction? [¶] A. No, he was not. [¶] Q. Why not? [¶] A. Two days before the end of trial Mr. Silva failed to appear and became a federal fugitive." Since defendant failed to

object to this testimony, he is precluded from challenging it on appeal. (Evid. Code, § 353.) In any event, in light of the other evidence in the case, the mere fact of defendant's fugitive status could not have affected the jury's penalty verdict.

### D. *Consideration of Sympathy at the Penalty Phase*

■ Defendant contends that the trial court "extracted . . . promises from the jurors that they would not consider 'sympathy' in arriving at their verdict." He bases this claim upon the court's voir dire questioning of prospective jurors. In determining whether a prospective juror would be able to vote for the death penalty, the court asked whether an objective determination of that sentence could be made, setting aside feelings of sympathy, prejudice or bias. Defendant suggests that those jurors who were asked this question remembered it two months later and included it along with the other penalty phase instructions. We find defendant's claim lacks merit.

At the outset, we observe that the court's voir dire questions were previously *approved* by the prosecutor and defense counsel. Second, there is no indication in the record that the court was asking the jurors to impose the death penalty without considering sympathy for *defendant,* the court's questions seem more directed toward assuring that the jurors would not vote to impose the death penalty based on unwarranted sympathy for defendant's victims, or prejudice toward defendant. Finally, these questions were asked on voir dire, when the jury's attention was not yet focused on the penalty issues. Any error was thus undoubtedly harmless. (Cf. *People* v. *Ghent* (1987) 43 Cal.3d 739, 769-770 [239 Cal.Rptr. 82, 739 P.2d 1250].)

Our conclusion is fortified by the fact that the penalty phase closing arguments made it clear that mitigating "sympathy" factors, such as defendant's background or character, were relevant to the jury's decision. Defense counsel, who argued first, explained that this decision required "balancing the equities," including defendant's "background, his age, his character . . . , all factors." The prosecutor disagreed that there were mitigating aspects of defendant's character, but he never argued that the sympathy considerations cited by defense counsel were legally irrelevant. As he explained, "The point now is [for the jury to decide] what could possibly, possibly come into this case to soften what we now know Mr. Silva did. What is there to weigh against the propriety, against the rightness of the maximum punishment?" Thus, the jury was not misled regarding the propriety of considering defendant's background, character and other "sympathy" evidence. (See *People* v. *Easley* (1983) 34 Cal.3d 858, 878, and fn. 10 [196 Cal.Rptr. 309, 671 P.2d 813].)

### E. *Consideration of Uncharged Crimes*

Defendant asserts the court erred in failing to instruct sua sponte that evidence of prior crimes of which defendant was not convicted must be proved beyond a reasonable doubt before the jury may consider them as aggravating factors. (See *People* v. *Robertson* (1982) 33 Cal.3d 21, 53-55 [188 Cal.Rptr. 77, 655 P.2d 279].) The jury was informed that defendant had suffered two prior felony convictions: one in 1972 for grand theft, and one in 1980 for manufacturing drugs and for being a felon in possession of a firearm.

Evidence was admitted to show the circumstances of defendant's arrest for the 1980 charges. One of the arresting officers testified that at the time of defendant's arrest for attempt to manufacture methamphetamine and possession of machine guns, he pointed a pistol at defendant and ordered him to "freeze." The officer was a few feet outside the building which housed the drug lab; defendant was inside the building, standing near a window. Upon seeing the officer and hearing the command to freeze, defendant calmly stepped back from the window, lit a flare, and threw it into the lab, blowing it up.

Defendant suggests that, in addition to the crimes of which he was convicted, the evidence outlined above may have been improperly considered by the jury as showing the crimes of "malicious mischief, arson or the destruction of property." We find this contention unconvincing. At no time did the prosecution argue to the jury that it should consider damage to the building during its penalty deliberations. Indeed, a review of the record reveals that the property damage caused by defendant was largely irrelevant to the argument and consideration of the death penalty. The evidence was introduced solely to demonstrate to the jury that defendant was able to react calmly when faced with a pistol and a command not to move.

As previously discussed, the thrust of the prosecution's penalty phase closing argument was that the circumstances of Kevin's murder constituted the only relevant aggravating factor. Rather than emphasize defendant's prior felony convictions, the prosecutor disclaimed the idea that they would justify a death sentence. And while the court instructed the jury that it could consider defendant's prior convictions, defendant was not convicted of "malicious mischief, arson or the destruction of property," and at no time did the prosecution argue that defendant should be sentenced to death because he set fire to a building.

### F. *Prosecutorial Misconduct*

Defendant asserts two separate instances of prosecutorial misconduct. Although he failed to object to these statements below (*People* v. *Green, supra,* 27 Cal.3d 1, 27), we nonetheless address the merits.

### 1. *Defendant's Future Dangerousness*

In an attempt to rebut defense evidence and argument regarding defendant's ability to coexist peaceably in a prison environment, the prosecutor argued defendant's potential for future dangerousness. According to defendant, relying on *People* v. *Murtishaw* (1981) 29 Cal.3d 733, 773 [175 Cal.Rptr. 738, 631 P.2d 446], "predictions of future dangerousness,' *even if reliable*, would be beyond the scope of our death penalty legislation" (italics in original) and therefore inadmissible. (See also *People* v. *Boyd, supra,* 38 Cal.3d 762, 775-776 [limitations on evidence admissible at penalty phase under 1978 death penalty law].)

In *People* v. *Miranda* (1987) 44 Cal.3d 57 [241 Cal.Rptr. 594, 744 P.2d 1127], we indicated that "a prosecutor's comments on a defendant's future dangerousness are 'within the proper bounds of argument to the jury.' [Citation.]" (P. 111.) In *Miranda,* we doubted that "a prosecutor's comments during closing arguments present the same potential for prejudice" as an expert's prediction of violence. (*Ibid.*) Moreover, in the present case, the prosecutor's argument was aimed at rebutting defendant's own evidence and argument to the effect that he would pose no threat in prison if sentenced to life imprisonment without possibility of parole. (See *People* v. *Boyd, supra,* 38 Cal.3d at p. 776 [permitting similar rebuttal evidence].) We conclude that no misconduct occurred here.

### 2. *Mandatory Sentencing Instruction and Argument*

Defendant also contends that it was improper for the prosecutor to argue to the jury (paraphrasing the language of § 190.3) that, "if you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death." Defendant relies upon our opinion in *People* v. *Brown* (1985) 40 Cal.3d 512 [220 Cal.Rptr. 637, 709 P.2d 440], vacated on other grounds *sub nom. California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934, 107 S.Ct. 837], where we stated that, "The word ['shall'] connotes a mental balancing process, but certainly not one which calls for a mere mechanical counting of factors on each side of the imaginary 'scale,' or the arbitrary assignment of 'weights' to any of them." (*Id.* at p. 541.)

As we explained in *People* v. *Allen, supra,* 42 Cal.3d 1222, our concern in *People* v. *Brown, supra,* 40 Cal.3d 512, was that a jury receiving the unadorned standard instruction previously used in many capital cases (CALJIC No. 8.84.2) might fail to appreciate the proper nature and scope of its "weighing" responsibility, or might fail to realize that inherent in the weighing process was an obligation to determine whether death is the *appropriate* punishment in that case.

The court in the present case modified the standard instructions and expressly informed the jury that, "You are further instructed that you are not to count the factors in aggravation and compare that with the number of factors in mitigation in determining which of the penalties shall be imposed. *It is not the relative number of factors which shall determine the appropriate penalty but rather the weight of the factors which shall determine which of the penalties is appropriate.* You may assign to each of the factors the weight, if any, to which you believe it to be entitled." (Italics added.)

The special instruction given by the court both explained the jury's obligation to determine the appropriateness of the death penalty, and further advised that this determination was to be made on the basis of a weighing, not counting, of the various aggravating and mitigating factors. Moreover, nothing in counsel's closing arguments, previously summarized, could have misled the jury in these respects. We conclude, therefore, that no *Brown* error occurred in this case.

### G. *Ramos Error*

 Defendant's motion for new trial based upon purported *Ramos* error (*People v. Ramos* (1984) 37 Cal.3d 136, 158-159 [207 Cal.Rptr. 800, 689 P.2d 430]) was denied. We find no error.

Defendant's claim is based in part on the following discussion—held out of the presence of the jury—during the penalty deliberations: "THE COURT: The jurors have sent the following question: One, does anyone have the authority to override the penalty . . . decided by this jury; and two, does life in prison without possibility of parole mean just that, or is parole possible at some future date? If so, under what circumstances? [¶] As to question #1 . . . if it is [death], there are two automatic reviews, mine and the Supreme Court. If it is [life without parole], there is an appeal; it cannot be made into [death] but could be reduced from [life without parole]. [¶] As to does life in prison without possibility of parole mean just that or is parole possible at some future date; if so, under what circumstances? *That clearly cannot be answered.* [¶] *Do you agree, [defense counsel], that #2 couldn't be answered under the new case which just came out?* [¶] [DEFENSE COUNSEL] *That's correct, your Honor.* [¶] THE COURT: Mr. Depasquale, do you agree that at least as to #2, that question could not be answered? [¶] MR. DESPASQUALE: I WOULD AGREE THAT AT LEAST UNDER THE *R* DECISION, #2 CANNOT BE ANSWERED. [¶] THE COURT: Now, I think it is not that clear as to question #1. I would suggest that it should follow the *Ramos* decision, although it is not the same question. *But for me to tell the jury that I will review their verdict if it is death, and then the Supreme Court will review it, I think suffers from the same infirmity as the question of the Governor's right to commute the sentence.* I think it suggests an easy way out

to the jury and allows them then to think in terms of the Pontius Pilate theory, 'I wash my hands of it.' So I'm inclined, unless I hear some very persuasive argument to the contrary, to indicate to them that I can answer neither of their questions. [¶] [DEFENSE COUNSEL:] *I concur that you can answer neither of the questions.*" (Italics added.)

Defense counsel then suggested that the court tell the jury, "that neither of these considerations are factors which they are to take into consideration when deciding their verdict." The court responded, "I think I'd best not give any more opportunity for error than is inherent in the two questions." It subsequently informed the jury that, "I cannot under the law answer either of the questions which you have sent out. I cannot discuss it further than that."

Defendant moved for a new trial for failure to give the requested answer to the jury. The court denied the motion, concluding, "my response . . . was the only response that the court could appropriately give." Defendant now contends that, under *People* v. *Ramos, supra,* 37 Cal.3d 136, 154-159, his new trial motion was improperly denied. We disagree. In *Ramos,* at page 159, footnote 12, we stated that when the jury itself raises the commutation issue during deliberations, "the matter obviously cannot be avoided and is probably best handled by a short statement indicating that the Governor's commutation power applies to both sentences [life without parole and death] but emphasizing that it would be a violation of the juror's duty to consider the possibility of such commutation in determining the appropriate sentence. (Cf. *People* v. *Morse* [1964] 60 Cal.2d 631, 648 [36 Cal. Rptr 201, 388 P.2d 33, 12 A.L.R.3d 810].)"

In the present case, the trial court did not have the benefit of *Ramos's* admonition, but nonetheless we find no prejudicial error occurred here. The court's response in no way resulted in diverting the jury's attention from its sentencing task nor in informing it of any misleading "half-truths," unlike the so-called Briggs Instruction criticized in *Ramos.* The response left the jury in the same position as when the jury asked the question—i.e., uncertain of the answers. It is inconceivable that such uncertainty affected the jury's penalty verdict. (See also *People* v. *Hovey* (1988) 44 Cal.3d 543, 583-584 [244 Cal.Rptr. 121, 749 P.2d 776].)

H. *Defendant's Motion to Modify the Sentence*

Defendant contends that the trial court failed to exercise its discretion in considering defendant's motion for modification of the sentence. According to defendant, the court instead relied entirely upon the jury's verdict. The record illustrates the contrary to be true. In denying the motion to reduce the sentence to life without possibility of parole, the court

observed, "It is not the function of the Trial Bench and the State of California to determine the social propriety of the death penalty. It only determines when a particular case is one which falls within the guidelines established for its imposition. And in this case, the facts of the case . . . the factors of the crimes themselves are such that it would be an abuse of this court's discretion not to impose the death penalty in this case, and the court will impose the death penalty."

The court further explained, "I am not personally familiar with any crime more heartless or coldblooded [than the machine gun murder of Kevin Thorpe]." The court concluded that, "one of the special allegations is that the murder was especially heinous, atrocious and cruel, manifesting exceptional depravity in violation of Penal Code [section 190.2, subdivision] (a)(14). [¶] There has been some argument that those terms are vague and indefinite; it should be noted specifically for the record that they are. And the Court specifically finds that that particular allegation is not and was not necessary to the appropriateness of the sentence imposed in this case. [¶] And clearly this murder was especially heinous, atrocious and cruel, manifesting exceptional depravity, but it was not and is not, this court finds, necessary for the imposition of the death penalty. There are other allegations which were found to be true; they were more than sufficient to justify the imposition of the death penalty." We believe that the record clearly shows that the court exercised its discretion rather than relying upon the jury's verdict.

Defendant also asserts that the court considered improper aggravating circumstances in independently sentencing defendant to death, specifically, the murder of Laura. He bases this conclusion upon the court's statement that, "It . . . cannot be denied [that] the young people forfeited their lives as soon as [defendant] and his companions saw them at the gas station. From that point on they had no chance [of] surviving more than a few days."

It is clear from a reading of the entire record that the court was fully aware that defendant had been acquitted of Laura's murder, and that the court did not rely upon that offense in imposing the death penalty. We therefore reject defendant's claim that the court improperly considered Laura's murder as an aggravating circumstance; nowhere in the record does the court indicate or imply that it was doing so.

## I. *Proportionality Review*

Defendant's final contention is that his sentence was "arbitrary, discriminatory, and disproportionate" and, therefore, unconstitutional. He provides no factual basis for this claim. In essence, defendant urges that we adopt

some system of proportionality review. We have previously declined to do so. (*People* v. *Rodriguez* (1986) 42 Cal.3d 730, 777-778 [230 Cal.Rptr. 667, 726 P.2d 113].) Moreover, the facts of this case clearly indicate the death penalty is not disproportionate punishment for this defendant. (*People* v. *Dillon* (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697].)

### Conclusion

The heinous-murder, witness-murder and financial-gain-murder special-circumstance findings are vacated. In all other respects, the judgment is affirmed.

Mosk, J., Panelli, J., Arguelles, J., Eagleson, J., and Kaufman, J., concurred.

**BROUSSARD, J.,** Concurring and Dissenting—I concur in the majority's affirmance of guilt and of the felony-murder special-circumstance finding. I also concur in the setting aside of the special circumstance findings: murder for financial gain, witness-murder and heinous, atrocious or cruel murder. I dissent from the affirmance of the death penalty.

I cannot agree that the jury's consideration of the three invalid special circumstance findings in this case "was harmless error and could not have affected its penalty verdict." (Maj. opn., *ante,* at p. 633.) Rather, this error taken singly was very probably prejudicial, and was certainly so when viewed in combination with the erroneous admission of defendant's threat to kill a police officer in prison.

We begin by addressing the majority's assertion that the setting aside of three special circumstance findings in this case does not compel reversal of defendant's death sentence, for which they cite as authority the decision of the United States Supreme Court in *Zant* v. *Stephens* (1983) 462 U.S. 862 [77 L.Ed.2d 235, 103 S.Ct. 2733] and our own opinion in *People* v. *Allen* (1986) 42 Cal.3d 1222 [232 Cal.Rptr. 849, 729 P.2d 115]. As will be seen, neither of these decisions is applicable to the present case. The majority also err in their assessment of the prejudicial impact of the excessive special circumstance findings in this particular case.

In *Zant, supra,* 462 U.S. 862, the United States Supreme Court upheld a death sentence under the Georgia death penalty statute despite the fact that, of the three statutory aggravating circumstances on which the jury had rested its sentencing decision,[1] one (that the offense was committed by a

---

[1] The statutory aggravating circumstances in the Georgia law under consideration in *Zant* were roughly analogous to California's special circumstances inasmuch as the jury had to find at least one such circumstance to exist before considering the defendant for the death penalty. (462 U.S. at pp. 866, 870-872 [77 L.Ed.2d at pp. 243, 245-247].)

person having a substantial history of serious assaultive criminal convictions) was later held to be unconstitutionally vague. (462 U.S. at p. 867 [77 L.Ed.2d at pp. 243-244].) Relevant to the court's holding, however, was the fact that under the Georgia law the statutory aggravating circumstances played no express part in the jury's consideration of whether a death-eligible defendant should receive the ultimate penalty.[2] Of course, the same cannot be said of the California statute, which directs that any special circumstance found true shall also be considered in aggravation at the penalty phase of the capital trial (Pen. Code, § 190.3, factor (a))[3] and specifies that the jury shall weigh the aggravating and mitigating factors presented to determine whether death is the appropriate penalty. (§ 190.3, last par.; *People* v. *Brown* (1985) 40 Cal.3d 512, 538-541 [220 Cal.Rptr. 637, 709 P.2d 440], revd. on other grounds *sub nom. California* v. *Brown* (1987) 479 U.S. 538 [93 L.Ed.2d 934; 107 S.Ct. 837].)

That *Zant* has no application to the present situation is made clear by the court's observation there that in upholding the defendant's conviction under the Georgia statute "we do not express any opinion concerning the possible significance of a holding that a particular aggravating circumstance is 'invalid' under a statutory scheme in which the judge or jury is specifically instructed to weigh statutory aggravating and mitigating circumstances in exercising its discretion whether to impose the death penalty." (462 U.S. at p. 890 [77 L.Ed.2d at p. 258].) In the present case the jury's death verdict rested in part upon the weight, if any, which it assigned to its earlier finding that defendant's offense was "heinous, atrocious or cruel" (§ 190.2, subd. (a)(14)), a special circumstance which this court has found must be set aside as unconstitutionally vague. (Maj. opn., *ante,* at p. 631); *People* v. *Superior Court (Engert)* (1982) 31 Cal.3d 797, 806 [183 Cal.Rptr. 800, 647 P.2d 76].) Thus this case presents precisely the situation on which the United States Supreme Court declined to rule in *Zant,* and on which it has yet to express an opinion.[4]

---

[2] "In Georgia, unlike some other States, the jury is not instructed to give any special weight to any aggravating circumstance, to consider multiple aggravating circumstances any more significant than a single such circumstance, or to balance aggravating against mitigating circumstances pursuant to any special standard. Thus, in Georgia, the finding of an aggravating circumstance *does not play any role in guiding the sentencing body in the exercise of its discretion,* apart from its function of narrowing the class of persons convicted of murder who are eligible for the death penalty." (462 U.S. at pp. 873-874 [77 L.Ed.2d at pp. 247-248], fn. omitted, italics added.)

[3] All further statutory references are to the Penal Code.

[4] In *Barclay* v. *Florida* (1983) 463 U.S. 939 [77 L.Ed.2d 1134, 103 S.Ct. 3418], the court again upheld a death sentence based in part on an improperly considered aggravating circumstance, this time under the Florida statute. That law, unlike the Georgia statute at issue in *Zant, supra,* 462 U.S. 862, was a "weighing" statute like California's, in the sense that it included an instruction to the sentencer (the trial judge under the Florida statute) to weigh certain statutory aggravating and mitigating circumstances in determining whether to impose death in a given case. (*Barclay, supra,* 463 U.S. at pp. 952-953, 954 [77 L.Ed.2d at pp. 1145-

This case is also readily distinguishable from *Allen, supra,* 42 Cal.3d 1222. The defendant in *Allen* was found guilty of three first degree murders, one of them a witness-murder within the meaning of section 190.2, subdivision (a)(10).[5] He also had a prior murder conviction. Based on these facts, the prosecutor alleged, and the jury found, eleven special circumstances: three for the prior murder conviction (§ 190.2, subd. (a)(2)), six for multiple murder (§ 190.2, subd. (a)(3)) and two for the witness-murder, based on the two alternative grounds set forth in the statute. (See *ante,* fn. 5.) This court set aside eight of these eleven findings as improperly duplicative: two of the three arising from the prior murder conviction (42 Cal.3d at p. 1274, citing *People* v. *Harris* (1984) 36 Cal.3d 36 [201 Cal.Rptr. 782, 679 P.2d 433]), five of the six multiple-murder special circumstances (42 Cal.3d at p. 1273, also citing *Harris, supra*) and, despite the presence of both alternative grounds, one of the two witness-murder special circumstances as well. (42 Cal.3d at pp. 1273-1274.)

We found the excessive special-circumstance findings in *Allen, supra,* 42 Cal.3d 1222, not prejudicial to the penalty decision in that case, since they did not entail the consideration of any evidence not otherwise admissible and relevant to the jury's decision. We noted that the jury was fully aware of the defendant's three present murder convictions, including one witness murder, and of his prior murder conviction. The jury was therefore aware— indeed the prosecutor explained to them in precise terms—that the multiple-murder special circumstances involved only three murders and that the witness-murder and prior-murder-conviction special circumstances, despite their numbers, involved only one witness murder and one prior conviction. (*Id.,* at pp. 1281-1282.)

Unlike those at issue in *Allen* (*supra,* 42 Cal.3d 1222), two of the excessive special circumstances here—witness-murder and heinous, atrocious or cruel murder—were not merely duplicative of others properly found, they

---

1147].) However, unlike the aggravating circumstance under consideration in *Zant,* the one at issue in *Barclay* (defendant's criminal record) did not suffer from any federal constitutional defect (*Barclay, supra,* at p. 951, fn.8 [77 L.Ed.2d at p. 1144]); rather its consideration was simply improper under state law because it was a circumstance not enumerated in the statute. (*Id.,* at p. 956 [77 L.Ed.2d at p. 1148].) This distinguished *Barclay* from *Zant* (*Barclay, supra,* at p. 951, fn. 8 [77 L.Ed.2d at p. 1144]), but it also left unaddressed the situation expressly left open in the earlier case: whether the court would uphold a death verdict imposed under a "weighing" statute where the sentencing decision was based in part on a constitutionally invalid aggravating circumstance. (*Zant, supra,* 462 U.S. at p. 890 [77 L.Ed.2d at p. 258]; see Pascucci, et al., *Capital Punishment in 1984: Abandoning the Pursuit of Fairness and Consistency* (1984) 69 Cornell L.Rev. 1129, 1181.)

[5] Subdivision (a)(10) provides that a special circumstance exists where the murder victim was (1) a witness to a crime (other than the crime during the commission of which the victim was killed) who was intentionally killed for the purpose of preventing his or her testimony in any criminal proceeding or (2) a witness to a crime who was intentionally killed in retaliation for testifying in a prior criminal proceeding.

were invalid in and of themselves.[6] Each involved an improper characterization of the evidence which, but for the finding of a special circumstance, might not have been considered in aggravation at the penalty phase. The jury in *Allen* did not improperly consider in aggravation the fact that the defendant was before them for three murders, that one of his present victims was killed to prevent testimony and/or in retaliation for prior testimony, and that he had a prior murder conviction. By contrast the jury here was erroneously allowed to consider certain aspects of defendant's crime—specifically, its findings that the victim was killed to prevent future testimony and that defendant's offense was "heinous, atrocious or cruel"—not only in aggravation but as circumstances sufficient, each alone, to render defendant eligible for the death penalty.

If, as this court has repeatedly recognized, the consideration of *duplicative* special circumstances "improperly inflates the risk that the jury will arbitrarily impose the death penalty" (*Harris, supra,* 36 Cal.3d at p. 67; *Allen, supra,* 42 Cal.3d at pp. 1273, 1274; *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1150 [240 Cal.Rptr. 585, 742 P.2d 1306]), then the possibility of prejudice is only greater where special circumstances have been alleged and found which are invalid even *on their own.* This possibility of prejudice would have been present even if, as the majority conclude (maj. opn., *ante,* at pp. 634-635), the prosecutor had not exploited the invalid findings in his closing argument. Contrary to the majority's view, however, the prosecutor's references to the invalid special circumstances were repeated ones, and while the thrust of the argument may have been to dwell on the circumstances of the crime in general and the lack of circumstances in mitigation, the effect of those references was to keep alive in the jurors' minds the improper characterization of certain of the circumstances in aggravation of defendant's crime.[7]

---

[6] The financial-gain special circumstance, of course, while improperly found in this case, was duplicative in the sense that it was based on circumstances underlying the validly found felony-murder (kidnapping for robbery) special-circumstance finding.

[7] The prosecutor alluded to the excessive special-circumstance findings four times during his closing argument. "The murder of Kevin Thorpe, kidnapped, to rob him, *killed for financial gain, killed to prevent his testimony, killed to prevent this day.* And indeed *heinous, atrocious, cruel,* depraved behavior. *This has already been decided. It's not a matter for determination of* [sic] *whether these circumstances exist.* The point now is what could possibly, possibly come into this case to soften what we know [defendant] did. What is there to weigh against the propriety, against the rightness of the maximum punishment? [¶] The circumstances of the crime and the existence of those special circumstances, *those four special circumstances that you found to be true?* The circumstances of this crime these kidnappings, robberies, possession of these weapons.? This murder? What weighs against this?" (Italics added.) Later, following a discussion of a number of the statutory mitigating factors, he argued: "Did these—are there mitigating circumstances that are even to be considered on the same scale with this *heinous* murder *for financial gain* and *to prevent testimony?* What is there that's even considerable in this case compared to those crimes and the murder of Kevin Thorpe? Nothing in this evidence is on the scale to outweigh that aggravation. . . ." (Italics

Where there has been error, the absence of its exploitation by the prosecutor is not in any case dispositive of the issue of prejudice. The jury's findings here also deprived *defendant* of any argument he might otherwise have made that, horrible as his offense was, there was no particular aspect in which it was "more horrible" than any other murder committed during a robbery or kidnapping, such that defendant should be any more deserving of death than the perpetrator of the latter crime. (See *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 788 [230 Cal.Rptr. 667, 726 P.2d 113] ["the purpose of 'aggravating' and 'mitigating' factors is to assess the seriousness of a capital crime in relation to others of the same general character"]; cf. *Gregg* v. *Georgia* (1976) 428 U.S. 153, 201 [49 L.Ed.2d 859, 890, 96 S.Ct. 2909].) It is precisely because the words "heinous, atrocious or cruel" do not provide a jury with constitutionally sufficient guidance to separate those murders for which the death penalty is a possibly appropriate penalty from those for which it is not, that the special circumstance described in section 190.2, subdivision (a)(14) was declared invalid. (*Engert, supra,* 31 Cal.3d 797.) Similarly, the language of section 190.2, subdivision (a)(10) itself makes clear that a witness-murder special circumstance does not exist where the crime to which the victim was a witness is the crime during the course of which the victim was killed. (See *ante,* fn. 5, p. 645; maj. opn., *ante* at p. 631.) Defendant in this case was precluded from arguing that the circumstances of his crime did not necessarily militate in favor of a sentence of death by findings, rendered under two concededly invalid or inapplicable provisions, that certain aspects of his offense were not only aggravating but sufficient to elevate him into the category of death-eligibility. These improper findings may well have affected the jury's verdict.

I also disagree with the majority's finding that the admission of defendant's in-custody threat to kill a police officer was harmless error. (Maj. opn., *ante,* at p. 636; see *People* v. *Boyd* (1985) 38 Cal.3d 762 [215 Cal.Rptr. 1, 700 P.2d 782].) The prosecutor put on only two witnesses at the penalty phase: one who testified to an incident connected with an earlier, drug-related arrest and one who testified to defendant's threatening statement. In addition, the prosecutor put on evidence of prior felony convictions for auto theft, attempted drug manufacture and weapons possession. Other than the threat, however, none of the evidence presented involved violence or threats of violence. Thus this erroneously admitted penalty evidence may have colored significantly and unfavorably the jury's view of defendant's past

---

added.) Then: "The man is calm, calculated, careful. He decides to do these things. He has [*sic*] decided in a series of events that took place 13 months ago, he decided to end it all for Kevin Thorpe. In a series of events, exhibiting what sounds like incredible calmness, *for these purposes of gain, to prevent testimony, to keep from getting caught,* but there are indications that that consciousness was present before the crimes even started. [']We will do this sort of thing and then in order to keep from being caught we will do away with this person.[']" (Italics added.)

actions and of his continued dangerousness if imprisoned rather than executed.

While the question of prejudice is admittedly close, there is a reasonable possibility that the combined effect of (1) the jury's consideration of three invalid special circumstances, including two that were nonduplicative of the special circumstance properly found, and (2) the admission of defendant's threatening statement, was to tip the jury's decision in favor of death. The penalty should therefore be reversed.

Appellant's petition for a rehearing was denied July 28, 1988. Broussard, J., was of the opinion that the petition should be granted.