[No. B005743. Second Dist., Div. Four. July 22, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
DAVID BRUCE SHANDLOFF et al., Defendants and Appellants.

374

376

**COUNSEL**

Steven M. Sindell, Hecht, Diamond & Greenfield and Roger Jon Diamond for Defendants and Appellants.

John K. Van de Kamp, Attorney General, Carol Wendelin Pollack and Christine C. Franklin, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

ARGUELLES, J.—Appellants, David Bruce Shandloff (Shandloff) and Aquilino Antonio Ordonez (Ordonez), pleaded guilty to a violation of Health and Safety Code section 11352, transporting cocaine into the state, after denial of their motions to suppress evidence pursuant to Penal Code section 1538.5. Each was sentenced to a three-year state prison term. Appellants appeal from the denial of their suppression motions.

FACTS[1]

On June 12, 1981, Deputy Gary Fredericks of the Los Angeles County Sheriff's Department was assigned to narcotics investigation and was monitoring a Pan Am flight from Miami to Los Angeles International Airport due to arrive at about 10:30 a.m.

Deputy Fredericks, another deputy sheriff and four United States Drug Enforcement Administration agents were present and all were in plain clothes when the flight arrived. Deputy Fredericks had made numerous arrests of drug couriers arriving on flights from Miami, which was known to him as a source city for cocaine and marijuana.

---

[1]The appellants' and People's counsel stipulated that the preliminary hearing transcript be incorporated into the record for purposes of the suppression motions.

Deputy Fredericks saw Ordonez deplane first, carrying no luggage. A few seconds and about 10 to 12 passengers later, Shandloff disembarked. Only Ordonez and Shandloff appeared to walk separately from the crowd, though they did not walk together. Shandloff stopped several times and looked around in all directions. As the two appellants walked toward the top of the escalator and were about 50 feet apart, they appeared to look at each other.

Appellants met at the bottom of the escalator where Ordonez said to Shandloff, "I'll get the car. You get the baggage and the suitcases." At that point, Ordonez handed Shandloff an envelope that he had removed from his pants pocket. Shandloff took what appeared to be two airline tickets from the envelope and handed it back to Ordonez. Then the two separated again.

Shandloff put the airline tickets in his rear pants pocket and proceeded to the baggage claim area. In the 10 minutes it took for the baggage to arrive, Fredericks observed Shandloff pace back and forth, look outside, shift his weight from one foot to another and perspire heavily, though it was not particularly hot inside the baggage claim area.

Shandloff removed four suitcases from the baggage carousel and removed baggage claim stubs from the tickets Ordonez had given him.

As Deputy Fredericks positioned himself near Shandloff and the four suitcases, he detected what he described as a "strong chemical odor" coming from the suitcases. He bent down to get a better smell and concluded that the odor seemed to emanate from all four suitcases.

Although Deputy Fredericks testified at the preliminary hearing that he had smelled that same odor in connection with cocaine on two prior occasions, his testimony at the suppression hearing was that he had detected the same odor numerous times in the course of about 40 separate cocaine seizures in the preceding year and a half but that the two occasions he had testified to earlier were the only ones in the preceding six months where the smell had been as strong. Based upon this odor, after having observed the behavior of appellants after deplaning, Deputy Fredericks formed the opinion that the suitcases contained cocaine.

Deputy Fredericks followed Shandloff and the suitcases out of the terminal to the sidewalk, where Shandloff set the suitcases down and appeared to wait for someone.

At that point, Deputy Fredericks approached Shandloff, showed him his badge, told him he was with the sheriff's department and was conducting a

narcotics investigation, and asked if he would mind talking to him. Deputy Fredericks did not display his weapon or touch Shandloff. Shandloff responded, "No, I don't mind. What can I do?"

Deputy Fredericks advised him that he felt that there might be contraband in the suitcases because of the strong chemical odor emanating from them.

Shandloff responded that he was carrying the suitcases to Los Angeles for someone and that someone else had packed the suitcases with his things. When Deputy Fredericks asked Shandloff to produce identification, Shandloff complied but stated that he had lost his airline tickets.

Just then, Ordonez was walking back towards the terminal in Shandloff's direction from an adjacent parking lot but apparently saw Shandloff with Deputy Fredericks and went into the terminal.

As Deputy Fredericks caught up with him, Ordonez was standing at an airline ticket counter. The deputy told Ordonez he was conducting a narcotics investigation, and he displayed his badge. He asked if Ordonez would mind talking to him, to which Ordonez responded, "No, what can I do?" Although Deputy Fredericks requested some identification from Ordonez, Ordonez did not produce any. In response to Deputy Fredericks' question as to his purpose at the airport, Ordonez stated that he had just come to the airport to check on a San Francisco flight. When Deputy Fredericks asked him if, to the contrary, he had just arrived on a flight from Miami, Ordonez answered, "No, I just drove here to the airport to check on a San Francisco flight." Ordonez then agreed to go with Deputy Fredericks to where Shandloff was.

Deputy Fredericks, appellants with their suitcases, and the other law enforcement officers then walked to the drug enforcement administration's office at the airport where the appellants were separated, with Ordonez going into one room and Shandloff and the suitcases going into another.

When Deputy Fredericks asked Shandloff if he could open the suitcases, Shandloff told Fredericks that he could open two of them but to remember that he did not pack them. However, instead of Deputy Fredericks opening the two suitcases, Shandloff opened them. Deputy Fredericks then observed and recovered narcotics paraphernalia and a number of sealed mailing envelopes that, when they were opened, were found to contain a white powdery substance resembling cocaine.

When Deputy Fredericks then asked if he could open the other two suitcases, Shandloff responded, "They're not mine, but you can open them."

Before he opened the suitcases, Deputy Fredericks observed name tags on them bearing the name Ordonez. He then pried open the two suitcases and found their contents to be similar to the first two suitcases. He then arrested appellants.

### CONTENTIONS

Both appellants contend: (1) that the trial court erred prejudicially in concluding that there was probable cause to detain them; (2) that the search and seizure of the suitcases violated the federal and state Constitutions; and (3) that the scope of the search exceeded the scope of the consent.[2]

Additionally, Shandloff contends that any consent to search was invalid as it was a mere submission to authority.

### DISCUSSION

#### 1. *Detention of the Suspects*

■ "The law is well-established that 'in order to justify an investigative stop or detention the circumstances known or apparent to the officer must include specific and articulable facts causing him to suspect that (1) some activity relating to crime has taken place or is occurring or about to occur, and (2) the person he intends to stop or detain is involved in that activity. Not only must he subjectively entertain such a suspicion, but it must be objectively reasonable for him to do so: the facts must be such as would cause any reasonable police officer in a like position, drawing when appropriate on his training and experience (*People* v. *Superior Court* (*Kiefer*) [1970] 3 Cal.3d [807,] 827 [91 Cal.Rptr. 729, 478 P.2d 449, 45 A.L.R.3d 559]), to suspect the same criminal activity and the same involvement by the person in question. ■ The corollary to this rule, of course, is that an investigative stop or detention predicated on mere curiosity, rumor, or hunch is unlawful, even though the officer may be acting in complete good faith. (*Terry* v. *Ohio* [1968] 392 U.S. [1,] 22 [20 L.Ed.2d (889,) 906-907 (88 S.Ct. 1868)].)' (*In re Tony C., supra,* 21 Cal.3d [888] at p. 893 [148 Cal.Rptr. 366, 582 P.2d 957], fn. omitted; see also *Reid* v. *Georgia* (1980) 448 U.S. 438, 440 [65 L.Ed.2d 890, 893, 100 S.Ct. 2752]; *Brown* v. *Texas* (1979) 443 U.S. 47, 51 [61 L.Ed.2d 357, 362, 99 S.Ct. 2637].)

---

[2]As the seizures in this case occurred prior to the effective date of Proposition 8, the "Victims' Bill of Rights" (Cal. Const., art. I, § 28, subd. (d)), its "truth-in-evidence" provision does not apply here. (*People* v. *Smith* (1983) 34 Cal.3d 251 [193 Cal.Rptr. 692, 667 P.2d 149].)

Accordingly, Ordonez can assert Shandloff's constitutional rights. (*Kaplan* v. *Superior Court* (1971) 6 Cal.3d 150 [98 Cal.Rptr. 649, 491 P.2d 1].)

■ "An appellate court's review of a motion to suppress evidence is also governed by well-settled principles. The trial court's factual findings relating to the challenged search or seizure, 'whether express or implied, must be upheld if they are supported by substantial evidence.' (*People* v. *Lawler* (1973) 9 Cal.3d 156, 160 [107 Cal.Rptr. 13, 507 P.2d 621].) ' "The trial court also has the duty to determine whether, on the facts found, the search was unreasonable within the meaning of the Constitution." (*Ibid.*) Because "that issue is a question of law," the appellate court is not bound by the substantial evidence standard in reviewing the trial court's decision thereon. Rather, . . . in such review it is "the ultimate responsibility of the appellate court to measure the facts, as found by the trier, against the constitutional standard of reasonableness." (*Ibid.*) On that issue, in short, the appellate court exercises its independent judgment.' (*People* v. *Leyba* (1981) 29 Cal.3d 591, 597 [174 Cal.Rptr. 867, 629 P.2d 961], fn. omitted, quoting *People* v. *Lawler, supra,* 9 Cal.3d at p. 160.)" (*People* v. *Loewen* (1983) 35 Cal.3d 117, 123 [196 Cal.Rptr. 846, 672 P.2d 436].)

■ The trial court below found that the investigatory stop of appellants was a "detention" and, therefore, permissible only if the police had an "objective, articulable basis" for suspecting them of criminal conduct. (See *Wilson* v. *Superior Court* (1983) 34 Cal.3d 777, 784 [195 Cal.Rptr. 671, 670 P.2d 325].)

■ Appellants argue that the odor emanating from their luggage could not properly form part of the basis for such an objective, articulable suspicion because (1) their privacy rights were violated and (2) the investigating police officer lacked the requisite expertise as to chemical odors. We disagree.

■ On the subject of privacy rights involving the escaping smell of contraband, the California Supreme Court has stated the rule as follows:

"In our view, the escaping smell of contraband from luggage may be likened to the emanation of a fluid leaking from a container. The odor is detectable by the nose, as the leak is visible to the eye. We discern no constitutionally significant difference in the manner of escape, and conclude that any privacy right is lost when either escapes into the surrounding area." (*People* v. *Mayberry* (1982) 31 Cal.3d 335, 342 [182 Cal.Rptr. 617, 644 P.2d 810].) Even the objection stated in the dissent to *Mayberry,* that " 'A rose by any other name would *not* make this a "plain smell" case' " (*id.,* at p. 343) would have no validity here because it was a police officer's rather than a dog's nose, as in *Mayberry,* that detected the chemical odor.

■ Thus, the officer's smelling of the area immediately surrounding the suitcases was not a search and did not violate the privacy rights of appellants.

As to appellants' contention that Deputy Fredericks lacked expertise as to drug odors, this contention lacks merit. Deputy Fredericks' prior experience with the same odor associated with cocaine was sufficient to arouse a reasonable suspicion here. (See *People* v. *Lilienthal* (1978) 22 Cal.3d 891, 898-899 [182 Cal.Rptr. 617, 644 P.2d 810]; *People* v. *Briggs* (1976) 62 Cal.App.3d 817, 821 [150 Cal.Rptr. 910, 587 P.2d 706].) Deputy Fredericks testified that the odor he detected emanating from the luggage was the same odor he had smelled numerous times over the course of approximately 40 different cocaine seizures in which he was involved during the preceding year and a half.

■ We next turn to appellants' contention that the officer's observations of them under the circumstances were insufficient to arouse an objective, articulable suspicion that they were engaged in criminal activity.

Recent cases analyzing confrontations—whether "consensual encounters" or "detentions"—between law enforcement officers and suspected drug couriers at major international airports, "where . . . reasonable privacy expectations are of significantly lesser magnitude" (*Florida* v. *Royer* (1983) 460 U.S. 491, 515 [75 L.Ed.2d 229, 248, 103 S.Ct. 1319], quoted in *Florida* v. *Rodriguez* (1984) 469 U.S. 1, — [83 L.Ed.2d 165, 171, 105 S.Ct. 308), focus on the observed behavior of the suspects in relation to a number of behavorial characteristics associated with known drug couriers. Some of these behavorial characteristics appear in what is known as the "drug courier profile"[3] while others simply have been derived from the past observations of individual law enforcement officers.

In *Wilson* v. *Superior Court* (1983) 34 Cal.3d 777 [195 Cal.Rptr. 671, 670 P.2d 325], relied upon by appellants here, the California Supreme Court held that mere "eye contact" between a suspected drug courier and a plain clothes officer could not justify a detention where the officer conceded that "he could not articulate any objective basis for differentiating the 'eye contact' of drug couriers from that of other persons" even though such eye contact was consistent with the behavior of persons he had previously arrested for transporting narcotics. (*Id.,* at pp. 780-781.)

Similarly, mere conformance of the observed behavior of the courier suspects with the so-called "drug courier profile" has been held to be insufficient to form the basis of an objective, articulable suspicion where: (1) the suspects arrived from a known source city of cocaine trafficking; (2) they

---

[3]The "drug courier profile," which appellants claim was relied upon here, has been described as "a somewhat informal compilation of characteristics believed to be typical of persons unlawfully carrying narcotics." (*Reid* v. *Georgia* (1979) 448 U.S. 438, 440 [65 L.Ed.2d 890, 894, 100 S.Ct. 2752].)

arrived in the early morning when law enforcement activity was diminished; (3) they appeared to conceal the fact that they were traveling together; and (4) they appeared to have no luggage other than their shoulder bags. (*Reid v. Georgia, supra,* 448 U.S. 438, 440-441 [65 L.Ed.2d 890, 894].) In *Reid,* the United States Supreme Court found that, of the evidence relied on, "only the fact that the petitioner preceded another person and occasionally looked backward at him as they proceeded through the concourse relates to their particular conduct." (At p. 441 [65 L.Ed.2d at p. 894].) The remainder of the articulated circumstances were found by the court to "describe a very large category of presumably innocent travelers." (*Id.,* at p. 441 [65 L.Ed.2d at p. 894].)

In contrast, the United States Supreme Court in *Florida v. Rodriguez, supra,* 469 U.S. 1 [83 L.Ed.2d 165], recently found that suspects who, before they were confronted, (1) had spoken furtively to one another after spotting the plain clothes officers, and one of whom had advised the others to "get out of here," (2) attempted to evade the officers, and (3) made contradictory statements concerning their identities were justifiably detained on the basis of an articulable suspicion. The only reference by the court to the association between the suspects' behavior and the behavior of known drug couriers was in the acknowledgment that the officer who made the observations "had special training in narcotics surveillance and apprehension." (*Id.,* at p. — [83 L.Ed.2d at p. 171].)

Thus, the relevant recent cases dealing with the issue indicate that something more than observed behavioral characteristics of courier suspects consistent with those of known drug couriers may be necessary in order for the totality-of-the-circumstances to give rise to an objective, articulable suspicion of criminal activity that will justify a detention. Here, the "something more" consisted of the strong chemical odor emanating from the suspects' suitcases in the airport baggage claim area, Shandloff's contradictory statement concerning his possession of airline tickets, Ordonez' contradictory statements about his purpose and manner of arrival at the airport, and Ordonez' apparent efforts to evade the officers.

■ Appellant Shandloff contends, however, that the trial court erred in finding that there was a detectable odor emanating from the suitcases at the time he was detained. In support of this contention, he cites the expert witness testimony of Jay Williams, a senior criminalist with the Ventura County Sheriff's Department laboratory, in which Williams stated his opinion that cocaine itself has no odor. However, Williams also testified that an odor might be present in cocaine as a result of some impurity in the cocaine or an additive, or if wet, and Williams acknowledged that the slight odor he detected at trial could have been much stronger two years earlier if it

had come from inside the mailing package, and if it were not wrapped in plastic. In the face of such equivocal testimony, the trial court was entitled to believe Deputy Fredericks' testimony and conclude from all of the evidence that such an odor indeed was present at the time of Shandloff's detention. (See *People* v. *Smith* (1972) 26 Cal.App.3d 404, 409 [102 Cal.Rptr. 625].)

■ We, therefore, concur with the trial court's finding that the detention of the suspected drug couriers here was justified.

### 2. *Scope of Consensual Search*

■ Appellants' contention that the investigating officers exceeded the scope of the consent to search the suitcases when they opened sealed mailing envelopes inside the suitcases lacks merit.

The trial court found that the investigating officers "obtained appropriate consent as to the luggage" and that they "properly followed the proscriptions and rules and regulations of the Fourth Amendment and associated decisions."

■ We first address the issue of whether the consent was voluntary.

■ "The question of the voluntariness of consent is one of fact, to be determined by the trial court. The trial court's finding must be upheld if supported by substantial evidence. [Citations.] [¶] . . . [¶] The People had the burden of proving that defendant's manifestation of consent was the product of his free will and was not a mere submission to an express or implied assertion of authority. (*People* v. *Johnson* (1968) 68 Cal.2d 629, 632 [68 Cal.Rptr. 441, 440 P.2d 921].)" (*People* v. *Williams* (1980) 114 Cal.App.3d 67, 71 [170 Cal.Rptr. 433].)

■ Deputy Fredericks testified that, prior to asking appellants for permission to search the suitcases, appellants were asked if they would accompany the plain clothes officers across the terminal to their office, which they agreed to do; appellants were not promised anything or threatened as an inducement to cooperate; no weapons were drawn at any time; Shandloff appeared agreeable but nervous, and Ordonez appeared very calm and cool. Upon their arrival at the security office, the two appellants were separated from each other with Shandloff being shown into a room with the suitcases. When the officers asked if they could search the suitcases, Shandloff said they could search two of the four that were his and Shandloff himself proceeded to open the two suitcases. Even after the officers observed and removed the sealed mailing envelopes from the suitcases, Shandloff did not

object or withdraw his consent. Instead, after the officers opened the envelopes and asked if they could look in the two remaining suitcases, Shandloff said "you can go ahead and open them," although he told the officers they were not his. Before opening them, Deputy Fredericks observed name tags on them bearing the name of Ordonez. At that point, Deputy Fredericks proceeded to the area where Ordonez was seated and asked him if the suitcases were his, to which Ordonez responded that they were not.

On the basis of this testimony, we believe that the People met their burden on the consent issue, and that substantial evidence supported the conclusion that the consent was voluntary.

■■■ Once the voluntary consent to search the suitcases was given, without any limitation or attempts to revoke the consent, the officers were authorized to search all of the compartments and containers within the suitcases.

In *People* v. *Williams, supra,* 114 Cal.App.3d 67, where the court held that the scope of consent to search an automobile included closed brown bags and envelopes in its trunk, the court explained: "Had the defendant wished to limit the scope of the search, he should have done so. We believe that the defendant intended, and the officer understood, that the consent encompassed the vehicle in its entirety including its contents. To hold otherwise would require an extended and potentially confusing colloquy between the officer and the subject in an effort to isolate the precise areas of the automobile to which the consent to search extended. We do not believe that the Fourth Amendment requires anything more than the defendant's voluntary consent to the search of property under his control." (*Id.,* at pp. 73-74.)

Such observations apply with even greater force here because Shandloff had been told previously that the officers suspected the suitcases contained narcotics and could thus anticipate their desire to open any containers found inside. (See *People* v. *Johnson* (1980) 108 Cal.App.3d 175, 180 [166 Cal.Rptr. 419].) Nevertheless, Shandloff at no time attempted to revoke or limit his consent.

The record thus supports the trial court's conclusion that the consensual search was proper.

## Disposition

The judgments are affirmed.

Woods, P. J., and McClosky, J., concurred.

Appellants' petitions for review by the Supreme Court were denied October 24, 1985.