[No. D016412. Fourth Dist., Div. One. Sept. 29, 1993.]

THE PEOPLE, Plaintiff and Respondent, v.
DANIEL GENE CALVERT, Defendant and Appellant.

1822

**COUNSEL**

Stuart A. Skelton, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Garrett Beaumont and Keith I. Motley, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**KREMER, P. J.**—Daniel Gene Calvert appeals his convictions of manufacturing, possessing for sale and transporting methamphetamine (Health & Saf. Code, §§ 11379.6, subd. (a), 11379, 11378) and convictions of conspiracy to manufacture, transport and possess methamphetamine for sale (Health & Saf. Code, §§ 11379.6, (subd. (a), 11379, 11378, Pen. Code, § 182, subd. (a)(1)). The court additionally found Calvert had a prior conviction of possessing methamphetamine for sale (Health & Saf. Code, §§ 11378,

11370.2, subd. (a)), committed the offense while on bail on an earlier felony offense (Pen. Code, § 12022.1) and the methamphetamine weighed more than three pounds (Health & Saf. Code, § 11370.4, subd. (b)(1)).

On appeal, Calvert contends the trial court erred in denying his motion to suppress. He argues the court erroneously found the search was pursuant to consent and authorized by Vehicle Code section 2805. Calvert also contends the court failed to advise him of his right not to incriminate himself before accepting submission of his case on grand jury transcripts and failed to state reasons supporting its decision to sentence consecutively. We affirm.

## Facts

In the summer of 1990, Calvert and his father rented storage units at a facility in Vista. Out of unit number 210 in the Vista storage facility, Calvert sold and manufactured methamphetamine. Calvert manufactured 36 pounds of methamphetamine in unit 210. He made at least $150,000 from selling the methamphetamine. Calvert claimed it cost him $700 to manufacture a pound of methamphetamine and he could sell methamphetamine for $7,000 to $10,000 per pound.

Calvert also allowed Sal Luna, who owned the "Auto Gallery," an automobile repair and sales shop on Miramar Road, to use unit 210 to dismantle stolen cars, in particular, stolen Porsches. Calvert also helped in dismantling the cars and wanted a front suspension from one of the stolen Porsches for his own Porsche. Luna did not want the stolen cars dismantled at the Auto Gallery because it was under the surveillance of the Auto Theft Strike Unit of the San Diego Police Department.

In July 1990, the police raided the Vista storage facility. Calvert fled to Tucson, Arizona.

While in Tucson, Calvert directed others to buy chemicals for manufacturing methamphetamine and to drive the chemicals to Tucson where he used the chemicals to make more methamphetamine. Calvert returned to San Diego on October 25, 1990. He went to Auto Gallery on Miramar Road, bringing with him six pounds of methamphetamine which he "cut" with "Vitablend" in the upstairs office. Calvert returned to Tucson.

Calvert, using the name David Russ, took over the Auto Gallery from Luna who owed him money. He renamed the business Russ Auto Motors.

On Sunday, November 24, 1990, Calvert returned to the business, bringing with him over three kilograms of methamphetamine. Calvert dumped the

methamphetamine onto a four-foot-by-four-foot mirror placed on the floor in an upstairs office. One of the employees at the repair shop, Michael Madrigal, saw the mound of drugs on the mirror and asked how much trouble he could get in for the drugs. Calvert jokingly said 20 years.

Sometime after 9:30 p.m. that Sunday evening, police officers from the auto theft strike unit passed by the Miramar shop, saw the lights on and decided to stop for an inspection. In the course of the inspection, one of the officers saw the drugs on the floor of the office.

DISCUSSION

I

*Validity of the Search*

Calvert contends evidence seized in the search of the auto shop on Miramar Road should have been suppressed.

A. *Facts Relating to Search*

On Sunday, November 24, 1990, police officers from the auto theft strike unit were returning from an unrelated drug raid when they saw lights on at the Miramar auto shop. Among the officers was Detective Michalek who had inspected the premises at least a dozen times and was familiar with the owner, Luna, and had become "social friends" with Luna's employees, Michael Madrigal and Grant Johnson. Detective Michalek had heard rumors stolen automobile parts were being stored at the Miramar shop. Sometimes in the past, owner Luna, had requested the auto theft strike unit to inspect vehicles to make sure there were no stolen parts. Luna was in the business of restoring and selling Porsches.

As the officers approached the Miramar shop, Detective Michalek's partner radioed and asked him if he wanted to take a look and see the owner. Detective Michalek said yes. The front of the Miramar shop facing the parking lot was all glass and consisted of a sales/showroom area where cars were displayed. Beyond the sales/showroom area were a number of bays for working on cars which had doors to the outside. Generally, when the auto theft strike unit had inspected the premises in the past, they had entered through the open bay doors. Upstairs there were offices as well as a parts room. The parts room could be accessed by a stairway in the back or by walking through the offices. The officers typically accessed the parts room by walking through the offices.

When the officers stopped at the Miramar shop on Sunday, November 24, they saw Madrigal in the sales/showroom area through the windows. Detective Michalek waved at Madrigal who waved back and started walking toward the front door to meet the detective. Madrigal arrived at the door first, opened it and Detective Michalek walked inside. They exchanged pleasantries. Detective Michalek introduced Sergeant Edward Becker and asked if they could look around. Madrigal said fine. Detective Michalek asked if Luna was around. Madrigal said Luna did not own the place anymore and Johnson was buying it.

Detective Michalek and Madrigal walked to the bay area where there were five cars in a state of disassembly. Detective Michalek asked if Johnson were around. Madrigal said he was not sure. Sergeant Becker heard someone walking upstairs and told Detective Michalek he was going to go upstairs to see if Johnson was there. The office doors were open and the light was on. At the doorway, Sergeant Becker announced he was from the auto theft strike unit but did not receive any response. He took a step inside the doorway that was wide open, saw another doorway that was wide open and two people standing next to a desk. Sergeant Becker saw a mound of powder on a mirror with a bucket beside it and assumed "it was probably plaster because [he] thought they were doing some work inside [the] office." He thought "they were mixing up some plaster to probably fix some holes in the walls or whatever."

Sergeant Becker identified himself and asked, "Are one of you Grant [Johnson]?" One of the men said he was Grant. Sergeant Becker said, "Good. We want to talk to you downstairs." He asked both men to come downstairs. Both walked by him to go downstairs. Johnson walked into the sales/showroom area while the other man walked out the front door.

After the men had started down the stairs, Sergeant Becker smelled marijuana burning in the room. He looked down at the white powder and saw "two snorting straws" next to the powder on the mirror. Then "it started to dawn on [him]" the powder might not be plaster but an illegal drug. A presumptive drug test was done on the powder indicating it was methamphetamine.

## B. *Law Relating to Administrative Inspections*

Calvert contends the trial court erred in ruling the search was a proper administrative inspection under Vehicle Code section 2805, which authorizes inspections of automobile repair shops and new or used car lots to examine the title or registration of vehicles and vehicle components for the purpose of locating stolen vehicles.

■ The Fourth Amendment's prohibition on unreasonable searches and seizures applies to commercial premises as well as to private homes. (*New York* v. *Burger* (1987) 482 U.S. 691, 699 [96 L.Ed.2d 601, 612, 107 S.Ct. 2636]; *People* v. *Doty* (1985) 165 Cal.App.3d 1060, 1066 [212 Cal.Rptr. 81].) While searches of private homes generally must be conducted pursuant to a warrant to be considered reasonable under the Fourth Amendment, the Legislature may enact statutes authorizing warrantless administrative searches of commercial property without violating the Fourth Amendment. (*Donovan* v. *Dewey* (1981) 452 U.S. 594, 598-599 [69 L.Ed.2d 262, 268-269, 101 S.Ct. 2534]; *People* v. *Paulson* (1990) 216 Cal.App.3d 1480, 1483-1484 [265 Cal.Rptr. 579].) The "greater latitude" to conduct warrantless inspections of commercial property reflects the significantly different expectation of privacy of an owner in commercial property compared to "the sanctity accorded an individual's home." (*Donovan* v. *Dewey*, *supra*, 452 U.S. 594, 598-599 [69 L.Ed.2d 262, 268-269].) The commercial property owner's privacy interests "may, in certain circumstances, be adequately protected by regulatory schemes authorizing warrantless inspections. [Citation.]" (*Ibid.*)

■ The administrative inspection exception to the warrant requirement applies to " 'closely regulated' " industries; " '[c]ertain industries have such a history of government oversight that no reasonable expectation of privacy . . . could exist for a proprietor over the stock of such an enterprise.' " (*New York* v. *Burger*, *supra*, 482 U.S. 691, 700 [96 L.Ed.2d at pp. 612-613], citations omitted.) To be a reasonable warrantless inspection, three criteria must be met: (1) ". . . there must be a 'substantial' government interest" underlying the regulatory scheme authorizing the inspection; (2) "the warrantless inspections" must be " 'necessary to further [the] regulatory scheme;' " and (3) " 'the statute's inspection program, in terms of the certainty and regularity of its application, [must] provid[e] a constitutionally adequate substitute for a warrant,' " i.e., ". . . the regulatory statute must perform the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers. [Citations.]" (*New York* v. *Burger*, *supra*, 482 U.S. 691, 702-703 [96 L.Ed.2d 601, 613-615]; *People* v. *Paulson*, *supra*, 216 Cal.App.3d 1480, 1485.)

Vehicle Code section 2805, in pertinent part, provides:

"(a) For the purpose of locating stolen vehicles, . . . a member of a city police department . . . whose primary responsibility is to conduct vehicle theft investigations, may inspect any vehicle of a type required to be

registered under this code, or an identifiable vehicle component thereof, on a highway or in any public garage, repair shop, terminal, parking lot, new or used car lot, automobile dismantler's lot, vehicle shredding facility, vehicle leasing or rental lot, vehicle equipment rental yard, vehicle salvage pool, or other similar establishment, or any agricultural or construction work location where work is being actively performed, and may inspect the title or registration of vehicles, in order to establish the rightful ownership or possession of the vehicle or identifiable vehicle component.

"As used in this subdivision, 'identifiable vehicle component' means any component which can be distinguished from other similar components by a serial number or other unique distinguishing number, sign, or symbol.

"
. . . . . . . . . . . . . . . . . . . . . . . . . . . .

"(c) Whenever possible, inspections conducted pursuant to subdivision (a) or (b) shall be conducted at a time and in a manner so as to minimize any interference with, or delay of, business operations."

 Vehicle Code section 2805 has been interpreted as authorizing searches of places open to the public. (*People* v. *Roman* (1991) 227 Cal.App.3d 674, 679 [278 Cal.Rptr. 44].)

### C. *Open to the Public*

Calvert contends the inspection of the Miramar automobile shop was not authorized by Vehicle Code section 2805 because the shop was not open to the public. He points to the lack of signs on the building, posted business hours, advertising and listed telephone number and asserts there was no business being conducted for the public on the premises as the only jobs in the shop were his privately owned vehicles. Calvert's argument is basically a challenge to the sufficiency of the evidence to support the trial court's determination the business was open to the public.

 When the sufficiency of evidence is attacked on appeal, the appellate court views the facts in the light most favorable to the trial court's determination, drawing all reasonable inferences in its support. (*People* v. *Pensinger* (1991) 52 Cal.3d 1210, 1236 [278 Cal.Rptr. 640, 805 P.2d 899]; *People* v. *Silva* (1988) 45 Cal.3d 604, 625 [247 Cal.Rptr. 573, 754 P.2d 1070].) The appellate court does not reweigh the evidence, resolve conflicts in the evidence, or reevaluate the credibility of witnesses. (See *People* v. *Jones* (1990) 51 Cal.3d 294, 314 [270 Cal.Rptr. 611, 792 P.2d 643].)

While Calvert points to evidence in the record supporting a conclusion the business was not open to the public, he ignores other evidence leading to a

contrary conclusion. The business had a glass front opening to a showroom area where cars were displayed. Madrigal testified the business had regular hours and he worked the same hours after Calvert bought the business. He testified when Calvert bought the business, they worked on Calvert's and Luna's cars and he also worked on cars for other customers. Madrigal testified the business was open to the public, stating people would come into the business and "the theory was to try to sell [the cars]." This evidence is sufficient to support the trial court's conclusion the business was open to the public.

No reversal is required on this ground.

### D. *Scope of Search*

Calvert contends the search exceeded the authorization of Vehicle Code section 2805 and seizure of the drugs cannot be justified under the plain view doctrine.

■ Under the plain view doctrine, ". . . if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant. [Citations.]" (*Minnesota* v. *Dickerson* (1993) 508 U.S. __ [124 L.Ed.2d 334, 344-346, 113 S.Ct. 2130, 2136-2137]; see also *People* v. *Webster* (1991) 54 Cal.3d 411, 431 [285 Cal.Rptr. 31, 814 P.2d 1273].)

Calvert argues Vehicle Code section 2805 only authorizes inspections of vehicles, their parts, title or registration and "could not reasonably have been interpreted as a carte blanche invitation to roam the premises." In particular, Calvert argues Sergeant Becker "had no authority to search the premises for Grant Johnson" or "to proceed upstairs to look in offices."

Here, the record indicates when the officers entered the premises, they asked, "Is Sal around?" Madrigal responded by telling them Sal Luna no longer owned the business and Johnson was buying it. The officers asked if Johnson was around. Madrigal responded he was not sure. Sergeant Becker heard someone upstairs and told Detective Michalek he was going upstairs to see if Johnson was there. He took a flight of stairs that went up to the offices on the second level. He was unaware that there were other stairs which led to the upstairs parts room. In previous inspections of the Miramar shop, the auto theft strike unit had usually used the stairs leading to the offices and walked through the offices to get to the parts room.

When Sergeant Becker arrived upstairs he found an open door and the lights on. From the open doorway, he twice called out "San Diego Police

Department, Auto Theft Strike Unit" but received no response. He stepped inside the doorway and through the wide open door of another office saw two men standing next to a desk. He asked if either of them was "Grant" and when Johnson identified himself, Sergeant Becker identified himself as from the auto theft strike unit and said they wanted to talk to him downstairs. From his position by the doorway, Sergeant Becker saw the powder on the mirror and after smelling burning marijuana and seeing two "snorting straws" identified the powder as contraband.

This evidence indicates the police, as part of the Vehicle Code section 2805 inspection, desired to speak to the owner who was apparently on the premises. This was reasonable. It is reasonable for the police to inform an owner who is on the premises of their intent to conduct an administrative inspection and to inform the owner of their authorization for that inspection.

In his attempt to locate the new owner, Sergeant Becker did not "roam the premises." He went upstairs, using a route typically used for getting to the parts room, a place where the police clearly had a right to be, saw lights on, identified himself as a member of the auto theft strike unit, proceeded further only when he received no response and did not open any closed doors. His attempt to locate the new owner was limited in scope, reasonable under the circumstances and involved places where the police normally would be in the course of their inspection.

■ We conclude Sergeant Becker had viewed the methamphetamine from a place where he was lawfully entitled to be and he had a lawful right of access to the object.

Calvert also contends the seizure of the methamphetamine cannot be justified under the plain view doctrine because the incriminating nature of the methamphetamine was not "immediately apparent." (See *Minnesota* v. *Dickerson, supra*, 508 U.S. __ [124 L.Ed.2d 334, 344-346, 113 S.Ct. 2130, 2136-2137].)

At the suppression hearing, Sergeant Becker testified his first thought when he saw the methamphetamine was that it was plaster and the men in the office were going to be using the plaster to make repairs. Sergeant Becker also testified after the two men left the room, he smelled marijuana burning in the room, looked down at the white powder and saw two "snorting straws" next to the powder on the mirror. Then "it started to dawn on [him]. . . . This is probably not plaster. We probably have something else." In other words, once Sergeant Becker smelled the burning marijuana and saw the "snorting straws" the incriminating character of the powder became immediately apparent.

No reversal is required on the ground the seizure of the methamphetamine was not justified by the plain view doctrine.

### E. *Pretextual Search*

Calvert contends the administrative inspection under Vehicle Code section 2805 was an unlawful pretext to search for drugs. His contention rests on the presence of members of the narcotics unit at the time Detective Michalek and the other officers were conducting the administrative inspection.[1]

Here, the evidence when viewed in the light most favorable to the trial court's ruling does not support Calvert's assertion the administrative inspection was merely a pretext to look for drugs. The undisputed evidence indicates Sergeant Becker went upstairs to look for the new owner, not drugs. Moreover, his reaction to seeing the pile of methamphetamine—to assume it was plaster—negates the suggestion Sergeant Becker or the other officers were really looking for illicit drugs.

Furthermore, so long as the officers had a proper justification for the search—here a Vehicle Code section 2805 inspection—it is irrelevant the officers may have also subjectively hoped to find evidence of other crimes. (See *People* v. *Uribe* (1993) 12 Cal.App.4th 1432 [16 Cal.Rptr.2d 127].)

No reversal is required on the ground the search was an improper pretextual search for drugs.

### F. *Constitutionality of Vehicle Code section 2805 as Applied*

Calvert contends Vehicle Code section 2805 is unconstitutional as applied to his business. He argues warrantless administrative inspections are permitted only of closely regulated businesses and his business, an automobile repair shop, is not a closely regulated business. He relies principally on *Long* v. *Van de Kamp* (C.D.Cal. 1991) 772 F.Supp. 1141 which held Vehicle Code section 2805 could not be constitutionally applied to automobile repair shops because the shops were not closely regulated and the Vehicle Code section 2805 inspection was an improper search for criminal investigation.

First, we note the Ninth Circuit Court of Appeals has vacated the decision in *Long* v. *Van de Kamp*. Second, we find the analysis in that case to be

---

[1]Calvert asserts there was evidence presented indicating the officers from the narcotics unit arrived almost at the same time as the auto theft strike unit and cites the record to support this assertion. The record citation does not support his assertion. Calvert cites the reporter's transcript at page 206 as support for his statement a narcotics officer with a trained sniffing dog remained outside. The cite does not support the statement.

incomplete and unpersuasive.[2] Our examination of the state's statutes and the regulations adopted pursuant to those statutes convinces us the automobile repair business is closely regulated.

### 1. *Regulations Relating to Automobile Repair*

The Legislature has enacted statutes governing automobile repair in a chapter of the Business and Professions Code (Bus. & Prof. Code, § 9880 et seq. [governing automobile repair dealers]) as well as in the Vehicle Code (see Veh. Code, §§ 10653 [requiring repair shops to report to the police any vehicle showing bullet marks], 12000-12003 [governing the installation and sale of new, used and/or defective automobile parts in passenger cars]). Further, pursuant to legislative authorization, the Director of Consumer Affairs has adopted regulations covering automobile repair dealers. (Bus. & Prof. Code, § 9882; see Cal. Code Regs., tit. 16, § 3350 et seq. [hereafter referred to as Regulations].)

Under the Business and Profession Code chapter, automobile repair dealers are required to register with the Director of Consumer Affairs. (Bus. & Prof. Code, § 9884; Regs., § 3351.) It is unlawful for a person to be an automotive repair dealer if he is not properly registered. (Bus. & Prof. Code, § 9884.6.)

An automobile repair dealer may be denied registration or have his registration revoked or suspended if he makes any false or misleading statements, including in written estimates for repair, in invoices, in records required to be maintained by the regulatory scheme, in advertising or to the customer in an attempt to persuade the customer to authorize repair or service. (Bus. & Prof. Code, § 9884.7, subds. (a), (b). & (h); Regs., §§ 3372.1-3373.) The Director of Consumer Affairs may also deny, suspend or revoke an automobile repair dealer's registration if the dealer engages in any other conduct which constitutes fraud or gross negligence. (Bus. & Prof. Code, § 9884.7, subds. (d) & (e).)

An automobile repair dealer may also be denied registration if he is convicted of a crime "substantially related to the qualifications, functions, or

---

[2]The court in *Long* v. *Van de Kamp, supra,* 772 F.Supp. 1141, concluded automobile repair was not a closely regulated industry. The court rejected the argument the registration requirement in Business and Professions Code section 9884 demonstrated the automobile repair industry was closely regulated because it was common requirement of businesses in California. The court's examination of the regulations adopted pursuant to the Business and Professions Code was cursory. The court, based on its determination automobile repair was not closely regulated, also concluded the search for stolen parts was for the purpose of enforcing a penal statute and conducting a criminal investigation and did not come under the administrative inspection exception to the warrant requirement.

duties of a registrant if to a substantial degree it shows that the registrant is presently or potentially unfit to perform the functions authorized by the registration in a manner consistent with the public health, safety, or welfare." (Regs., § 3395.2.) The superior court may issue an injunction against "any person [who] carries on, or attempts to carry on, a business as an automotive repair dealer or as a mechanic in violation of the provisions of [the Business and Professions Code chapter regulating automotive repair dealers], or any regulation made pursuant to [that] chapter." (Bus. & Prof. Code, § 9884.14.)

Automotive repair dealers are required to maintain records of "[a]ll invoices relating to automotive repair including invoices received from other sources for parts and/or labor;" "[a]ll written estimates pertaining to work performed;" and "[a]ll work orders and/or contracts for repairs, parts and labor." (Regs., § 3358.) These records are required to "be open for reasonable inspection and/or reproduction by . . . law enforcement officials during normal business hours." (Regs., § 3358, subd. (c); see also Bus. & Prof. Code, § 9884.11.)

The regulatory scheme requires automobile repair dealers to provide customers with a written estimate of repairs and with an invoice describing all service work done and parts supplied which clearly states if any used, rebuilt, or reconditioned parts are supplied and if the work was performed by someone other than the dealer or his employee. (Bus. & Prof. Code, §§ 9884.8, 9884.9, subd. (b); Regs., §§ 3353, 3356, 3359.) The regulatory scheme generally requires automotive repair dealers to return replaced parts to a customer upon request or allow the customer a reasonable opportunity to inspect the replaced part. (Bus. & Prof. Code, § 9884.10; Regs., § 3355.)

The Regulations also contain detailed provisions specifying the type and display of signs (including such details as the size of the sign, the type style and the color and type of paint) (Bus. & Prof., § 9884.17, Regs., §§ 3351.3, 3351.4); defining the accepted trade standards for the sale and installation of ball joints (Regs., § 3360.2), rebuilding of automatic transmissions (Regs., § 3361.1), and installation of ignition interlock devices (Regs., § 3363.4); and set out guidelines for price advertising (Regs., § 3372.1) and guarantees (Regs., § 3376).

In the Vehicle Code statutes governing the sale and installation of parts in passenger vehicles, the Legislature has required "[a]ny person who sells and installs new parts in passenger cars, in the ordinary course of his business" to "provide the customer with an invoice which identifies by brand name, or

other comparable designation, the part or parts installed." (Veh. Code, § 12001, subd. (a).) If the person sells and installs used or factory rebuilt parts in passenger cars in the ordinary course of his business, he is required to "provide the customer with an invoice which specifically designates the used part or parts installed." (Veh. Code, § 12001, subd. (b).) The Legislature has also prohibited persons from knowingly manufacturing, selling or installing any vehicle part which has been determined to be defective and subject to customer notification or recall. (Veh. Code, § 12002.) The Bureau of Automotive Repairs is authorized to enforce the provisions relating to automobile parts, to investigate and inspect retail outlets to insure compliance. (Veh. Code, § 12000.) An automobile repair dealer who violates these sections may be subjected to disciplinary action. (Regs., § 3395.3.)

## 2. *The Auto Repair Industry Is Closely Regulated*

The statutes and the regulations adopted pursuant to those statutes reveal the automobile repair industry is closely regulated. There are extensive, detailed regulations. The regulatory scheme covers everything from registration to advertising to customer interactions (e.g., written estimates, return of replaced parts) to recordkeeping requirements and elaborating standards for signs and replacement of certain automobile parts.

While much of the regulatory scheme is directed toward consumer protection (for example, in the provisions governing advertising, written estimates and guarantees), the regulatory scheme also contains provisions directed to the use of used automobile parts, parts which could come from stolen automobiles. For example, the Regulations contain record keeping requirements and provide "[a]ll work orders and/or contracts for repairs, parts and labor . . . shall be open for reasonable inspection and/or reproduction by . . . law enforcement officials during normal business hours." (Regs., § 3358, subd. (c).) The Regulations further provide a license may be denied, suspended or revoked due to certain criminal acts substantially related to the functions and duties of an automobile repair dealer.[3] Clearly, an automobile repair dealer engaged in receiving stolen automobile parts would be subject to denial or revocation of a license. The statutes and

---

[3]After the crime here was committed, a new provision dealing with vehicle identification information was adopted. Regulation section 3364 provides: "An automotive repair dealer shall not remove, paint over, or otherwise deface any label or sticker which has been affixed to the doorpost, dash, underhood, windshield, or other location on a vehicle, and which contains identifying information regarding the vehicle or its emission control system components. An automotive repair dealer shall replace any such label or sticker which would otherwise be destroyed as part of the repair process, unless the replacement label or sticker is not reasonably available." (Regs., § 3364, subd. (a).) This prohibition against removing or defacing identification information also applies "to any label or sticker mandated by the

regulations affecting automobile repair dealers also have numerous provisions designed to address automobile repair dealer honesty, e.g., the provisions requiring disclosure of the use of used automobile parts. ▉ Vehicle Code section 2805's inspection requirement advances automobile repair dealer honesty and helps to eliminate fraud since frequent inspections of the vehicles and component parts at an automobile repair dealership tend to reduce the dishonest and fraudulent use of stolen automobile parts to repair cars.

Vehicle Code section 2805 has been held constitutional as applied to a similarly regulated industry, auto dismantlers. (*People* v. *Grey* (1972) 23 Cal.App.3d 456, 461 [100 Cal.Rptr. 245]; see also *People* v. *Lopez* (1981) 116 Cal.App.3d 600, 605 [172 Cal.Rptr. 236]; *People* v. *Woolsey* (1979) 90 Cal.App.3d 994, 1002-1003 [153 Cal.Rptr. 746]; see also *New York* v. *Burger, supra,* 482 U.S. 691 [upholding the constitutionality of an administrative inspection of an automobile dismantler]; and see *State* v. *Bromell* (1991) 251 N.J. Super. 85 [596 A.2d 1105] [upholding the constitutionality of an administrative inspection of an auto body-repair shop].)

Calvert also argues, based on his conclusion California has no administrative scheme applicable to automobile repair shops, Vehicle Code section 2805's "only purpose is to uncover evidence of criminal violations" and improperly "gives the police an expedient means of enforcing the penal code without observing the guarantees of the Fourth Amendment."

Calvert's initial premise is erroneous. As we have demonstrated, California does have an extensive administrative scheme applicable to repair shops, including regulations dealing with the issues relating to stolen vehicles and parts.

The United States Supreme Court has not held an administrative inspection is unconstitutional merely because it responds not only to the administrative scheme but also to penal sanctions: "[A] State can address a major social problem *both* by way of an administrative scheme *and* through penal sanctions. Administrative statutes and penal laws may have the same *ultimate* purpose of remedying the social problem, but they have different subsidiary purposes and prescribe different methods of addressing the problem. An administrative statute establishes how a particular business in a 'closely regulated' industry should be operated, setting forth rules to guide an operator's conduct of the business and allowing government officials to

---

bureau [of automotive repair] or other governmental agency as well as those included with the vehicle as part of its original manufacture and those added onto a vehicle as part of a manufacturer's authorized recall program." (Regs., § 3364, subd. (b).)

ensure that those rules are followed. Such a regulatory approach contrasts with that of the penal laws, a major emphasis of which is the punishment of individuals for specific acts of behavior." (*New York* v. *Burger, supra,* 482 U.S. 691, 712-713 [96 L.Ed.2d 601, 619-621], italics in original.)

The Supreme Court in *New York* v. *Burger* noted the State of New York addressed the social problem of automobile theft both by penal laws punishing the theft of an automobile or its possession and by an administrative scheme ensuring "vehicle dismantlers are legitimate businesspersons and that stolen vehicles and vehicle parts passing through automobile junkyards can be identified." (*New York* v. *Burger, supra,* 482 U.S. at p. 714 [96 L.Ed.2d at p. 621].) Similarly, California's administrative scheme ensures automobile repair dealers are legitimate business persons and that stolen vehicles and their parts passing through a repair shop can be identified.

In sum, Vehicle Code section 2805 is not unconstitutional as applied to automobile repair shops; automobile repair shops are closely regulated and Vehicle Code section 2805 is a proper method of enforcing the administrative scheme.[4] We conclude the trial court properly denied Calvert's motion to suppress.[5]

II

*Advisements Prior to Submission on Grand Jury Transcript*

Calvert contends his convictions, except conspiracy to possess methamphetamine for sale, must be reversed because the court failed to advise him of his right to self-incrimination before accepting Calvert's submission of the remaining counts on the grand jury transcript.

---

[4]We also note there was evidence indicating Calvert was attempting to sell automobiles from the shop on Miramar Road. Automobile sales are also subject to close regulation by the state. There are several chapters in the Vehicle Code regulating vehicle sales. (See Veh. Code, §§ 11600 et seq. [vehicle lessor-retailers], 11700 et seq. [vehicle dealers], 11800 et seq. [vehicle salespersons].) Vehicle dealers and salespersons must be licensed and their licenses can be revoked for knowingly purchasing or selling a stolen vehicle. (Veh. Code, §§ 11613, subd. (a)(3), 11705, subd. (a)(5), 11806, subd. (d).) The administrative inspections under Vehicle Code section 2805 further the administrative scheme regulating vehicle dealers and salespersons, particularly the provisions prohibiting dealers and salespersons from knowingly purchasing or selling a stolen vehicle.

[5]Since we have concluded the seizure of the methamphetamine was proper pursuant to Vehicle Code section 2805 and the plain view doctrine, we need not discuss whether the search was also justified by consent. The trial court found Madrigal had the authority to permit a search and consented to the search. We note, however, the evidence suggested Madrigal's consent was based on a submission to an assertion of authority (the officers' right to search under Veh. Code, § 2805) and therefore we have concerns about whether the search was truly consensual. (*People* v. *James* (1977) 19 Cal.3d 99, 106 [137 Cal.Rptr. 447, 561 P.2d 1135]; *People* v. *Shandloff* (1985) 170 Cal.App.3d 372, 383 [215 Cal.Rptr. 916].)

■ When a defendant submits his case based on an evidentiary record such as a preliminary hearing or grand jury transcript which essentially establishes the defendant's guilt as a matter of law (sometimes called a slow plea), such a submission is tantamount to a guilty plea and the court, before accepting such a submission, must obtain the defendant's personal waiver of his right to a jury, to confront the witnesses against him, and of his right not to incriminate himself. (*People* v. *Wright* (1987) 43 Cal.3d 487, 491-493, 495-496 [233 Cal.Rptr. 69, 729 P.2d 260]; *Bunnell* v. *Superior Court* (1975) 13 Cal.3d 592, 605-606 [119 Cal.Rptr. 302, 531 P.2d 1086]; *In re Tommy E.* (1992) 7 Cal.App.4th 1234, 1237 [9 Cal.Rptr.2d 402].) The court's admonishments and the defendant's waivers of the rights must appear affirmatively on the record to show the defendant entered his plea understandingly and voluntarily. (*People* v. *Howard* (1992) 1 Cal.4th 1132, 1177 [5 Cal.Rptr.2d 268, 824 P.2d 1315].)

Failure to advise a defendant of his right against self-incrimination does not necessarily require reversal. The Supreme Court in *People* v. *Howard, supra,* 1 Cal.4th 1132, 1180 has explained: " '[A] plea of guilty is the most complete form of self-incrimination. By the plea, the defendant admits that he is guilty of the offense charged.' It is, thus, 'essential that the defendant know that he has a right not to plead guilty, and that the record show he knows it.' [Citation.] However, when the record demonstrates that knowledge there is 'no need to go farther and attach to such knowledge the talismanic phrase "right not to incriminate himself." ' [Citations.]"

Calvert pleaded guilty to conspiracy to possess methamphetamine for sale and then submitted the remaining counts to the court on the grand jury transcript. Before the court accepted his guilty plea to conspiracy to possess methamphetamine for sale, the court advised Calvert of his right to a jury trial, to confront and cross-examine witnesses, to present evidence in his own behalf and his right to remain silent. The court told Calvert: "You also have a right to remain silent, absolutely silent, in a jury trial, unless you choose to testify on your own behalf. In a jury trial, for example, Mr. Manning would have no right to call you as a witness. He doesn't have the right to call you as a witness at a trial. You have the right to remain absolutely silent."

The court asked Calvert if he understood his right to remain silent and after Calvert answered he understood, the court explained that when he pleaded guilty he would be giving up his right to remain silent and made sure Calvert understood that and wished to give up his right to remain silent.

Later in the same hearing, the court accepted Calvert's submission of the remaining counts on the grand jury transcript, but before accepting his

submission, the court reminded Calvert it had "already discussed what a jury trial is" and that he had "a right to be tried by a jury and have twelve people decide whether [he was] guilty or not guilty." The court then asked if Calvert had "any question [he wanted] to ask [the court] about [his] waiver of [his] jury right." Calvert indicated he understood his right to a jury trial and did not have any questions.

This record demonstrates Calvert was aware he had a right not to incriminate himself since shortly before Calvert entered his slow plea the court had fully outlined his right against self-incrimination while taking his guilty plea to conspiracy to possess methamphetamine for sale. The court had explained the right not to incriminate himself as it pertained to a jury trial and when accepting Calvert's slow plea reminded Calvert it had explained his jury trial right.

No reversal is required on this ground.

## III

*Reasons for Consecutive Sentences*

Calvert contends we must remand for resentencing because the court failed to state reasons to support its decision to order Calvert's conviction for transporting methamphetamine to be sentenced consecutively to his conviction for manufacturing methamphetamine.[6]

■ The sentencing court is required to state its reasons for imposing consecutive sentences and a remand for resentencing is proper when the court fails to state reasons for its sentence choice. (*People* v. *Lutes* (1981) 117 Cal.App.3d 830, 832 [173 Cal.Rptr. 300]; *People* v. *Jones* (1980) 111 Cal.App.3d 597, 604-605 [169 Cal.Rptr. 28].)

No remand is necessary here because the court stated reasons for imposing consecutive sentences at the time it resentenced Calvert on May 14, 1992. The court imposed a consecutive sentence for the transportation count "[b]ecause of its separateness and independence." The California Rules of Court authorize the imposition of consecutive sentences when the crimes "were predominantly independent of each other" or "were committed at different times or separate places." (Cal. Rules of Court, rules 425(a)(1), 425(a)(3).)

Here, the crimes were predominantly independent and were committed at different times and places. Calvert manufactured the methamphetamine in

---

[6]The court stayed the sentences on the other counts pursuant to Penal Code section 654.

July 1990 at the storage unit in Vista, California. He transported other methamphetamine which he had manufactured in Tucson, Arizona in November 1990 from Tucson to San Diego.

No remand for resentencing is called for in this case.

### DISPOSITION

The judgment is affirmed.

Benke, J., and Huffman, J., concurred.

Appellant's petition for review by the Supreme Court was denied December 16, 1993. Mosk, J., and Kennard, J., were of the opinion that the petition should be granted.